MILTON CULVER, *d. b. a.* CULVER'S FOOD MARKET,
v. JOHN NELSON AND OTHERS.[1]

May 29, 1952.

No. 35,595.

---

[1]Reported in 54 N. W. (2d) 7.

■■■■■

*Felhaber & Larson,* for appellant.

*J. A. A. Burnquist,* Attorney General, and *George B. Sjoselius,* Deputy Attorney General, for respondents.

KNUTSON, JUSTICE.

Plaintiff is a retail grocer doing business in the city of St. Paul. He brings this action, in his own behalf and in behalf of all others managing and operating retail food stores in the state of Minnesota, to obtain a declaratory judgment determining the proper construction to be placed on L. 1937, c. 354 (M. S. A. c. ,151), insofar as it affects his right, and those of others similarly situated, to sell at retail tablets, capsules, or liquids containing vitamins in their original packages as prepared by the manufacturer or distributor without giving any directions as to their use except such as are given on or in the package in which they are offered for sale. It is admitted that plaintiff is not registered as a pharmacist or assistant pharmacist, and that he does not, in the operation of his food store, employ a pharmacist or assistant pharmacist. It is also conceded that each of the boxes, vials, or containers in which the tablets or capsules are offered for sale contains the information required under the Federal Food, Drug, and Cosmetic Act (21 USCA, §§ 301–321b, 331–392) and the regulations issued thereunder and under the laws of this state.

Defendants are members of the state board of pharmacy. They contend that the products plaintiff seeks to offer for sale are drugs within the definition thereof contained in the state pharmacy law; that they may be sold only in a pharmacy under the personal supervision of a pharmacist or assistant pharmacist; and they have threatened to prosecute plaintiff if he sells the products here involved.[2]

---

[2]Neither party has raised the question whether a determination of the issues raised in this proceeding by a declaratory judgment would be avail-

The products plaintiff proposes to sell are prepared by the manufacturer for sale in the form of tablets, capsules, or liquids and are composed of pure [3] or concentrated vitamins, natural or synthetic, carried in a neutral vehicle or excipient, solid or liquid. Each box, vial, or other container of tablets, capsules, or liquids bears on the label the name and address of the manufacturer or distributor, the tradename given to the product by the manufacturer or distributor, and a description of the contents of the container. Some of the samples introduced in evidence contain the words "dietary supplement" or words of like import, indicating that the product is to be used as a dietary supplement intended to provide the minimum daily requirements of the type of vitamin contained in the tablet, capsule, or liquid. Others contain other directions. For instance, plaintiff's exhibits T, Y, and O, all of which are the same product, contain the statement: "Dosage: Adults and Children—One * * * [capsule] daily *or as directed by a physician.*" (Italics supplied.) Several of the exhibits state that the minimum need for certain named vitamins has not yet been established.

The pertinent portions of our statute involved in this action are as follows:

"151.15 It shall be unlawful for any person to compound, dispense, vend, or sell at retail, drugs, medicines, chemicals, or poisons in any place other than a pharmacy, except as provided in this chapter.

---

able in a criminal prosecution as an adjudication of the facts in issue. For a decision holding that it would not be so available, see Dept. of State v. Kroger Grocery & Baking Co. 221 Ind. 44, 46 N. E. (2d) 237.

[3]From the standpoint of a chemist, it is no doubt true that a substance is no longer pure when mixed with any other substance. From that viewpoint, it would be incorrect to refer to a combination of vitamins as a pure vitamin. However, the term "pure," as used herein, is intended to include as well a combination of two or more vitamins that do not lose their original characteristics or undergo a chemical change by virtue of a combination thereof, carried in an excipient, which likewise has no effect in changing the chemical makeup of the vitamin included in the final product.

"No proprietor of a pharmacy shall permit the compounding or dispensing of prescriptions or the vending or selling at retail of drugs, medicines, chemicals, or poisons in his pharmacy except under the personal supervision of a pharmacist or of an assistant pharmacist in the temporary absence of the pharmacist."

"151.01  Subdivision 1.  *  *  *

"Subd. 2. The term 'pharmacy' means a drug store or other established place regularly registered by the state board of pharmacy, in which prescriptions, drugs, medicines, chemicals, and poisons are compounded, dispensed, vended, or sold at retail.

"Subd. 3. The term 'pharmacist' means a natural person licensed by the state board of pharmacy to prepare, compound, dispense, and sell drugs, medicines, chemicals, and poisons.

"Subd. 4. The term 'assistant pharmacist' means a natural person licensed as such by the state board of pharmacy prior to January 1, 1930, to prepare, compound, dispense, and sell drugs, medicines, chemicals, and poisons in a pharmacy having a pharmacist in charge.

"Subd. 5. The term 'drug' means all medicinal substances and preparations recognized by the United States pharmacopoeia and national formulary, or any revision thereof, and all substances and preparations intended for external and internal use in the cure, mitigation, treatment, or prevention of disease in man or other animal, and all substances and preparations, other than food, intended to affect the structure or any function of the body of man or other animal.

"Subd. 6. The term 'medicine' means any remedial agent that has the property of curing, preventing, treating, or mitigating diseases, or that is used for that purpose."

"151.26  *  *  *  nothing in this chapter shall prevent the sale of common household preparations and other drugs, chemicals, and poisons sold exclusively for use for non-medicinal purposes.

"Nothing in this chapter shall apply to or interfere with the manufacture, wholesaling, vending, or retailing of non-habit forming harmless proprietary medicines when labeled in accordance

with the requirements of the state or federal food and drug act; nor to the manufacture, wholesaling, vending, or retailing of flavoring extracts, toilet articles, cosmetics, perfumes, spices, and other commonly used household articles of a chemical nature, for use for non-medicinal purposes."

Plaintiff contends (1) that the vitamin products which he proposes to sell in his food store constitute food or food products and are not drugs within the meaning of our statute; (2) that if such products are drugs within the meaning of our statute they are exempt from the operation thereof for the reason that they are common household preparations and are sold exclusively for use for nonmedicinal purposes; (3) that they are exempt from our statute for the reason that they are nonhabit-forming, harmless, proprietary medicines; and (4) that if the Minnesota pharmacy act restricts to pharmacists the sale of vitamin products offered for sale as dietary supplements the statute is unconstitutional.

■ There is agreement among counsel for the respective parties that our statutory definition of the term "drug" (§ 151.01, subd. 5) breaks down into three parts or categories, namely (a) medicinal substances and preparations recognized by the United States pharmacopoeia and national formulary or any revision thereof; (b) substances and preparations intended for external and internal use in the cure, mitigation, treatment, or prevention of disease in man or other animal; and (c) substances and preparations, other than food, intended to affect the structure or any function of the body of man or other animal.

(a) It is undisputed that the following vitamins are recognized by the United States pharmacopoeia: Vitamin A; Vitamin B1, Thiamin or Aneurin; Vitamin B2 or G, Riboflavin; Vitamin P-P, Nicotinic Acid or Amide; Vitamin C, Ascorbic Acid; Vitamin D2, Activated Ergosterol; Vitamin D3, Activated 7-dehydrocholesterol; Vitamin K (Synthetic) Menadione.

Some vitamins are not yet recognized by the United States Pharmacopoeia or national formulary. Among these are the following:

Vitamin B6, Pyridoxine; Vitamin Bc, Folic Acid; Vitamin K1.

All of the exhibits offered by plaintiff contain some of the vitamins recognized by the United States pharmacopoeia, and most of them contain several of such vitamins in various amounts and combinations. Plaintiff contends that none of the preparations he intends to offer for sale are recognized by the United States pharmacopoeia, but we do not consider that fact of controlling significance. If the constituent elements of these preparations are drugs within the meaning of our statute, the mere fact that several drugs compounded together are dispensed in a neutral excipient does not destroy their classification as a drug, nor will the fact that the United States pharmacopoeia or national formulary fails to recognize such combination of vitamins, which it does recognize separately, or that it is combined with other vitamins or some other neutral excipient, take it outside the category of drugs as defined by our statute. We are convinced that the products which plaintiff wishes to offer for sale come within the first category of our statutory definition of a drug. Nor does the fact that the United States pharmacopoeia recognizes other substances such as water, salt, sugar, honey, and many others which are normally used as food but may at times be used for medicinal purposes detract from the fact that the recognition of the vitamins described above sufficiently brings these vitamins within the statutory definition of a drug insofar as the first requirement of the statute is concerned. The mere fact that some products recognized by the United States pharmacopoeia are ordinarily considered as food but may be used for medicinal purposes at times does not necessarily lead to the conclusion that all products or substances recognized by the United States pharmacopoeia which are food elements must be classified as food so that they may be sold in food stores.

(b) It is noticeable that the term "substances and preparations" as used in the statutory definition of a "drug" given in paragraph (a) hereof is qualified by the word "medicinal." It must follow that only those substances or preparations used for medici-

nal purposes and recognized by the United States pharmacopoeia are classified as drugs under the statute referred to in paragraph (a) hereof. That vitamins are used internally for the cure, mitigation, treatment, or prevention of disease in man cannot well be subject to serious doubt. Even plaintiff's experts agree that a vitamin deficiency is or may be a disease and that when vitamins are prescribed for the treatment of such disease it is as a drug. Apparently, the difference of opinion is based on the size of the dosage required and the purpose for which the vitamin is administered. As stated by Dr. Bernard L. Oser, one of plaintiff's experts:

"* * * the difference between products of this type as drugs or as foods for special dietary purposes depends entirely on their dosage and how they are used. If they are used in the treatment of a diagnosed dietary deficiency disease and in large doses, such treatment usually entails the correct drugs, but when they are used in these small doses comparable to the amounts of vitamins furnished by the diet, then they are foods."

That some of the preparations plaintiff intends to offer for sale are intended for use in the treatment of such disease must be evident from plaintiff's exhibits T, Y, and O, where we find: "Dosage: Adults and Children—One * * * [capsule] daily, or as directed by a physician." An examination of the entire record has convinced us that the evidence sufficiently sustains the findings of the court that the preparations under consideration come within the classification of subdivision (b) of this opinion.

(c) There is no dispute that vitamins are a part of much of the food necessary to maintain life and permit growth. The question raised by this third subdivision is whether, since vitamins are component parts of food affecting the structure or function of the body of man, they may still be a drug when used to affect the structure or function of the body of man in a way that ordinarily is not true of food. Here, again, it must be admitted that vitamin deficiencies do arise which require treatment by administering vitamins of one kind or another, depending upon what the de-

ficiency consists of, so as to affect the structure or functions of a human body in a manner that it is impossible or impracticable to do by the consumption of food alone. It may be true that some or all of the exhibits offered by plaintiff are capable of use as food supplements and, when strictly limited to such use, could properly be classified as food, but it is not necessarily true that they need be so used. Nor is this action limited to the right to sell only those preparations covered by the exhibits alone. We believe that under this subdivision the true test is: Can the preparations now under consideration affect the structure or function of the body of man or other animal in a way not ordinarily affected by the consumption of food? As so tested, we hold that the preparations again fall within the statutory requirements. In other words, these preparations are not only capable of use as food supplements, but may be used for other purposes consistent with the statutory requirement that they affect the structure and function of the body of man in a manner not affected by foods.

While all of plaintiff's exhibits do not state specifically that they are intended as food supplements, they do prescribe the dosage required to furnish the recommended daily minimum requirements of the various vitamins contained in the preparation. It may therefore be said that if the user followed the directions on the container he would obtain the minimum daily requirements of such vitamins. Many of the exhibits contain a statement to the effect that the minimum daily requirements of certain vitamins have not yet been established. An examination of the exhibits shows that the following statement is contained on several: "the MDR for pyridoxine, calcium pantothenate, and nicotinamide has not been established." Even if we were to assume that the manufacturer or distributor of the product stated on the container that the preparation was intended as a food or dietary supplement, such statement, of itself, would not be conclusive of the issue now before us. The question is not so much what the manufacturer or distributor intends to sell the product for as what the consumer intends to use it for. Viewed in that light, it is clear that

these preparations may be used for something more than a dietary supplement.

The opinion of the many eminent specialists in the field of medicine and chemistry called by defendants is that the vitamin products here involved are drugs. We conclude that they meet all the requirements under the definition of a drug in our statute.

■ Are the preparations plaintiff desires to sell exempt from the operation of our statute for the reason that they are common household preparations sold exclusively for nonmedicinal purposes? Much of what we said above demonstrates that they are not sold exclusively for nonmedicinal purposes. The mere fact that they are harmless household remedies does not except the sale of the products from the operation of our statute unless they are also sold exclusively for nonmedicinal purposes. In State v. F. W. Woolworth Co. 184 Minn. 51, 56, 237 N. W. 817, 819, 76 A. L. R. 1202, we said:

"* * * a harmless household remedy, not a patent or proprietary medicine, sold and used solely or principally as a medicine, comes within the pharmacy law restricting the sale of drugs, medicines, and poisons."

Even if they are not sold principally for medicinal purposes, they come within the pharmacy law unless they are sold exclusively for nonmedicinal purposes. It is clear that the sale of the products here involved are not so limited. Here, again, reference to exhibits O, Y, and T is evidence of the fact that under some circumstances they are to be taken as directed by a physician. The evidence also amply sustains the court's findings that they are not sold exclusively for nonmedicinal purposes; as a consequence, they do not come within this exception of our statute.

■ Are the products exempt from our statute as harmless, nonhabit-forming proprietary medicines? The evidence will not sustain plaintiff's contention that all vitamins are harmless. It may be true that, if taken in limited quantities, the preparations offered in evidence will do no harm. The evidence does establish that some vitamins are harmful if taken in large amounts. Medi-

cal knowledge with respect to the mode of action of vitamins, it might be said, is in its infancy. Much remains to be discovered concerning them. But even if we hold that these preparations are harmless if taken as directed, they are not proprietary medicines. While it is difficult to exactly define proprietary medicines, it is much less difficult to determine those preparations which are not proprietary medicines, and that is as far as we need go.

In State v. Donaldson, 41 Minn. 74, 80, 42 N. W. 781, 783, we said:

" * * * what are called 'patent' or 'proprietary' medicines are prepared ready for immediate use by the public, put up in packages or bottles labelled with the name, and accompanied with wrappers containing directions for their use, and the conditions for which they are specifics. * * * There is nothing that calls into use any skill or science on the part of the one who sells them. One man can do it just as well as another, if he can read the label on the package and make change with the purchaser. The fact that the seller is a pharmacist, of itself, furnishes no protection to the public. The articles might as well be sold by a grocer or dry-goods merchant."

In State v. Zotalis, 172 Minn. 132, 214 N. W. 766, we held that aspirin, sold in a container with a label stating the contents and proper dosage and distributed by a designated laboratory and chemical company, was not a proprietary or patent medicine.

In State v. F. W. Woolworth Co. 184 Minn. 51, 53, 237 N. W. 817, 818, 76 A. L. R. 1202, and its companion case, State v. S. S. Kresge Co. 184 Minn. 59, 237 N. W. 820, we held that milk of magnesia, sold in the original bottle in which it came from the manufacturer, each bottle being closed by a sealing cap and having on its label in large letters the words "Milk of Magnesia," followed by the initials "U. S. P.," indicating that it was prepared in accordance with the formula contained in the United States pharmacopoeia, the label also containing directions. for use and having the name of the manufacturer thereon, was not a proprietary medicine.

Plaintiff contends that the proper definition of a proprietary medicine is to be found in Tiedje v. Haney, 184 Minn. 569, 575, 239 N. W. 611, 613, where we said:

"The word 'proprietary' as applied to medicines necessarily implies that the medicine has been compounded by a manufacturer who prepared the medicine according to his own formula, State v. Kendig, 133 Iowa, 164, 110 N. W. 463, 465; though probably it is not necessary that the formula should be the exclusive property of the maker or that the process be secret. It may have a character of its own according to the reputation of the manufacturer and the nicety with which it is prepared."

It is undoubtedly true that the formula for the preparation of a proprietary medicine need not be secret. However, there must be some right of ownership in either the method or manner of preparation of the vitamin which constitutes the beneficial ingredient of the ultimate product. The preparations now before us consist simply of natural or synthetic vitamins, which can be obtained or prepared by any laboratory having the necessary equipment and chemical knowledge, mixed together in various combinations, which likewise can be accomplished by any laboratory having the necessary knowledge concerning vitamins, and carried in an excipient, which is probably of no value medicinally, and one excipient could accomplish the same purpose as the other. About the only thing that is proprietary insofar as these products are concerned is the tradename under which they are offered to the public or in the excipients, which have no value either as food or drugs. In the Tiedje case, we were dealing with the responsibility of a druggist who obtained tablets or medicines from a manufacturer and thereafter sold them under his own name, accompanied by a statement that they were manufactured or prepared by such druggist. The seller, when sued for damages resulting from injuries alleged to have been caused by the toxic nature of the tablets, contended that he was not responsible for knowledge of the chemical content of the tablets, for the reason that they were proprietary medicines sold by him as prepared by the original manu-

facturer. The case is not authority for the proposition now under consideration. Obviously, before a medicine can be classified as a "proprietary" medicine it must be implied that it has been compounded by a manufacturer who prepared the medicine according to some formula of his own. It does not follow that all drugs or medicines compounded by a manufacturer and sold in the original container under the name of the owner who prepared the substance are proprietary medicines. It is significant to note that the Tiedje case was decided in the same year as State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202, *supra,* where we held that milk of magnesia sold in the original container was not a proprietary medicine. The products now under consideration are simply natural or synthetic vitamins of various kinds and combinations, carried or contained in a neutral excipient. Any manufacturer having the requisite skill and equipment could prepare any one of the preparations involved or one of a very similar nature. Under these circumstances, it cannot be said that the product is a proprietary medicine.

■ There remains for our consideration only the question whether the act involved, as here applied, is constitutional.

The evidence shows that the vitamin preparations of which samples were offered as exhibits were frequently sold in drugstores, by clerks who were not pharmacists, to any buyer without a prescription in the original package in which they were prepared for sale by the manufacturer, without any further instruction to the buyer than that which appeared on the package itself. Minn. Const. art. 1, § 7, provides:

"No person shall * * * be deprived of * * * property without due process of law."

Art. 4, § 33, reads:

"* * * The legislature shall pass no local or special law * * * granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever, * * *."

Plaintiff contends that if the sales of the vitamin products here involved are restricted to pharmacists the statutes so doing are in contravention of the above constitutional provisions; therefore, that the statute must fall.

The constitutionality of our pharmacy law has been before this court in several cases and has been sustained in all of them. Many of the points raised here have been disposed of by former decisions. State v. Donaldson, 41 Minn. 74, 42 N. W. 781; State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L. R. A. (N. S.) 1272, 10 Ann. Cas. 398; Minnesota State Pharmaceutical Assn. v. State Board of Pharmacy, 103 Minn. 21, 114 N. W. 245; State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202; and State v. Zotalis, 172 Minn. 132, 133, 214 N. W. 766, where we said:

"The statute should be sustained if enacted with reasonable reference to public health or welfare. If intended merely to give a monopoly to pharmacists or druggists by restricting sales to them it is not sustainable. It is only sustainable as a police measure.

\* \* \* \* \*

"It is not questioned that the sale of drugs, medicines and poisons may be regulated in the exercise of the police power."

Cases from other jurisdictions can be found which seemingly are contra to our former decisions. We do not feel compelled to follow them. We believe that the correct rule is as stated in State v. Zotalis, *supra*. The act should be sustained if it has a reasonable tendency to protect the public health or welfare. There are many kinds of vitamins, all of which are intended to be taken for different purposes and deficiencies and to alleviate different physical disabilities. Some are undoubtedly taken to prevent vitamin deficiencies and the physical disabilities which result therefrom. In the Zotalis case we also said (172 Minn. 133, 214 N. W. 766):

"The legislature thought that the dangers incident to its [aspirin] sale justified regulation and that a restriction of sales to pharmacists or to those under their supervision was effective.

It is true that no technical skill is required in making a sale. This does not prove the statute invalid. As remarked by the trial court, the pharmacist knows where to procure a pure and genuine article and his prescribing physicians will require him to furnish a pure drug."

Not only is a pharmacist in a better position to know where to procure a pure and genuine article, but he is equipped by training and education to know and advise prospective purchasers what products contain vitamins they seek in the best combinations. The record shows that many of the vitamins lose their strength and vitality by exposure to light or adverse temperature. A pharmacist is equipped by training to know how best to preserve the beneficial qualities of these products.

It is evident from the record that there is yet much to be learned about vitamins, particularly their mode of action. At the one extreme, it must be admitted that vitamins in a natural state in food are as much a part of food as other constituent elements. It must also be conceded that when food such as milk, flour, cereals, and many others are enriched in vitamin content by the addition of vitamins of one kind or other the substance still remains food. At the other extreme, it must be conceded that vitamins, natural or synthetic, pure or concentrated, are a drug when administered under the direction of a physician for the treatment of a vitamin deficiency, which all witnesses admit is a disease. It is interesting to note from the record that vitamin D can be obtained as well by exposure of the body to the sun, and, when so absorbed, it can hardly be classified as either a food or a drug. Somewhere between the two extremes mentioned above there may be a point where pure and concentrated vitamins, synthetic or natural, taken in small dosages to supplement the average daily diet of a human being, should be considered to a be a food rather than a drug. Just where this line of demarcation should be we are not prepared to say, nor can we so determine from the record on any rational basis.

The legislature has already excepted many products from the operation of the pharmacy law. The time may come when medical research in this field will reach such a state of perfection that the legislature, in its discretion, may see fit likewise to except from the operation of the law preparations containing specified quantities of named vitamins which have been found to be harmless. For the time being, we must be content to hold that pure and concentrated vitamins, natural or synthetic, prepared in the form of capsules, tablets, or liquids, and carried either as a single vitamin or in combination with other vitamins in an excipient and so offered for sale to the public, come within the definition of a drug in our pharmacy law and are not within any of the present exceptions thereto; as a consequence, they may not be sold or offered for sale in grocery stores. The pharmacy act, as applied to the facts now before us, is not so foreign to the protection of public health that it should be held to violate the constitutional provisions above mentioned.

Affirmed.