STATE, Appellant, vs. WAKEEN, Respondent.

*February 6—March 3, 1953.*

402

For the appellant there were briefs by the *Attorney General* and *William A. Platz,* assistant attorney general, and oral argument by *Mr. Platz.*

For the respondent there was a brief by *Johns, Roraff, Pappas & Flaherty* of La Crosse, and oral argument by *Robert D. Johns.*

A brief was filed by *Herbert L. Mount* of Milwaukee, for the Wisconsin Pharmaceutical Association as *amicus curiae.*

A brief was filed by *Cahill, Gordon, Zachry & Reindel* of New York, N. Y., and *Murphy & Gavin* of Madison, attorneys, and *John T. Cahill* and *James A. Fowler, Jr.,* of New York, N. Y., *Robert B. L. Murphy* of Madison, and *Keith M. Moffat* of New York, N. Y., of counsel, for the United States Pharmacopoeial Convention as *amicus curiae.*

FAIRCHILD, J.    The pertinent sections of the statutes are as follows:

151.04 (2) "No person shall sell, give away, barter, compound, or dispense drugs, medicines, or poisons, nor permit it, in a town, village, or city with a population of 500 or more unless he be a registered pharmacist, nor institute nor conduct a place therefor without a registered pharmacist in charge, except that a registered assistant pharmacist may do so under the personal supervision of a registered pharmacist, and may have charge during the pharmacist's necessary absence, not to exceed ten days.  If the population is less than 500, only a registered assistant pharmacist is required."

151.04 (3) "This shall not interfere with the dispensing of drugs, medicines, or other articles by physicians, nor with the sale of proprietary medicines in sealed packages, labeled to comply with the federal and state pure food and drug law, with directions for using, and the name and location of the manufacturer, nor with the sale of economic poisons for use in industrial arts, nor with the sale of economic poisons which comply with sections 94.67 to 94.71, nor with the sale of alum, ammonia, borax, bay rum, bicarbonate of soda, cream of tartar, concentrated lye, olive oil, sal ammoniac, sal soda, sulphur, copperas, epsom salts, glauber salts, castor oil, glycerine, senna leaves, indigo, blue vitriol, turpentine, wood alcohol, and denatured alcohol."

151.06 "The term 'drug,' as used in this chapter, means: (1) Articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and

"(2) All other articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and

"(3) Articles (other than food) intended to affect the structure or any function of the body of man or other animals; and

"(4) Articles intended for use as a component of any articles specified in subsections (1), (2), or (3); but does not include surgical, dental, or laboratory instruments, gases, oxygen therapy equipment, X-ray apparatus, or therapeutic lamps, their components, parts, or accessories; or equipment, instruments, apparatus, or contrivances used to render such articles effective in medical, surgical, or dental treatment; or articles intended for use or consumption in or for mechanical, industrial, manufacturing, or scientific applications or purposes."

The arguments advanced by the respondent upon this appeal were presented to the circuit court. As to the first issue, the trial court said:

"The first question then is whether the articles in question are proprietary medicines.

"Various definitions of the term 'proprietary medicines' have been presented to the court.

"Expert witnesses in testimony taken upon the hearing of the motions gave the following definitions:

" 'A proprietary medicine is one made according to the maker's own formula, all or partly secret, named with the name of his own choice, put up in original packages bearing his name as well as the name of the medicine and directions for the use of the same.' . . .

"Courts of other jurisdictions have given various definitions.

"The Iowa court in *State v. Jewett Market Co.* (1929), 209 Iowa, 567, 228 N. W. 288, in considering whether aspirin was a proprietary medicine, stated as follows:

" 'In *Ferguson v. Arthur,* 117 U. S. 482, 6 Sup. Ct. 861, 863, 29 L. Ed. 979, the court said: "Proprietary" is defined thus in the Imperial Dictionary: "Belonging to ownership; as, proprietary rights." In Webster: "Belonging or pertaining to a proprietor"—"proprietor" being defined, "One who has the legal right or exclusive title to anything, whether in possession or not; an owner." In Worcester: "Relating to a certain owner or proprietor." '

" 'In *State v. Zotalis,* 172 Minn. 132, 214 N. W. 766, the supreme court of Minnesota said "Aspirin is a coal-tar product commonly kept in drug stores and is used and sold for medicinal purposes. It is a drug or medicine within the statute. It is not a proprietary or patent medicine." '

" 'The record shows that aspirin was originally a proprietary medicine. It was discovered in Germany, its formula was secret, and the product was originally made only by the possessor of this secret formula. However, the formula has been discovered, and aspirin is now made by different pharmaceutical and chemical manufacturers, and it has entirely ceased to be a proprietary medicine. Therefore, it does not come within the exception noted in the statute referring to proprietary medicines.'

"The appellate court of Illinois has taken a different view in *State v. Ridgeway Drug Co.* 324 Ill. App. 585, 59 N. E. (2d) 351. The opinion of the court was not published, but the headnote provides:

" 'Proprietary medicines' within the Pharmacy Act are those prepared, put up, and boxed and ready for use by the public as soon as they leave the manufacturer's hands. Smith-Hurd Stats. ch. 91, sec. 36.

"All three of the articles in question have been held to be drugs and not proprietary medicines:

"Milk of Magnesia—*State of Minnesota v. F. W. Woolworth* (1931), 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202.

"Aspirin—*State v. Jewett Market* (1929), 209 Iowa, 567, 228 N. W. 288; *State v. Zotalis* (1927), 172 Minn. 132, 214 N. W. 766.

"Camphorated Oil—*Board of Pharmacy v. Abramoff* (1928), 141 Atl. 587, 6 N. J. Misc. 437; *Kratky v. Board of Pharmacy* (1929), 7 N. J. Misc. 970, 147 Atl. 726.

"The defendant contends that all three articles are common, harmless, useful household articles sold in their original containers, and that the pharmacist performs no function other than selling, and that the articles are, therefore, for no real or practical purpose different than recognized patent or proprietary medicines as far as the public is concerned and should be classified as proprietary medicines within the meaning of the statute.

"The three articles, aspirin, milk of magnesia, and camphorated oil are all manufactured by a multiple of persons or companies; sold under many different brand names and in many different kinds of containers, however the process, the contents and formula are known and are the same in all products regardless of the manufacture. There is nothing secret about it, their identity, quality, purity, and strength are set forth in the U. S. P. or N. F., and in fact are made to conform to the standards set therein. If they did not they could not be marketed under the names of aspirin, milk of magnesia, and camphorated oil.

"The U. S. P. and N. F. do not list proprietary medicines for the reason that there is something secret or legally protected about the product. All products listed in U. S. P., N. F., and H. P., can be produced by anybody provided they conform to the standards therein.

"Had the legislature intended aspirin, milk of magnesia, and camphorated oil to be sold without restriction it could have defined proprietary medicine so as to include them or could have directly exempted them as they have done with other drugs.

"It is the opinion of the court that under the present weight of authority aspirin, milk of magnesia, and camphorated oil are not proprietary medicines within the meaning of the statutes."

We concur with the opinion of the trial judge on the first issue.

It is next contended that sec. 151.06 (1), Stats., violates the Wisconsin constitution in that it is an unlawful delega-

tion of legislative authority to the private organizations located outside of the state which compile the publications referred to therein. This section of the statutes was enacted by the legislature in 1939. The defendant, in effect, concedes that the adoption by the legislature in its definition of drugs, of the articles listed in the publications as of 1939 might not be objectionable, but contends that the legislature's adoption in its definition of drugs of articles listed in future supplements to such publications is clearly unconstitutional.

Since about the year 1895 Wisconsin has prohibited the sale of drugs by persons who are not registered pharmacists. See sec. 1409g, Stats. 1898; State v. Maas, 246 Wis. 159, 16 N. W. (2d) 406. The old pharmacy law, for all practical purposes reading as sec. 151.04 (2), Stats., was upheld by this court in two cases, State v. Heinemann, 80 Wis. 253, 49 N. W. 818; State v. Evans, 130 Wis. 381, 110 N. W. 241. Even though sec. 151.06 were eliminated from the statutes, there would remain a workable and enforceable law. Sec. 151.04 would still prohibit the sale of drugs except by a registered pharmacist,—although expert testimony might be required to determine whether or not a doubtful article was a drug.

The defendant points to no particular provision of the Wisconsin constitution that was violated when the legislature enacted the statute now challenged. He relies upon a well-settled rule that the legislature may not delegate its power to make a law. This court has always recognized that rule. We have recognized, also, that the legislature may delegate any power which it may itself rightfully exercise which is not legislative. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 136 Wis. 146, 116 N. W. 905. This court has recognized also the rule that the legislature may enact a statute, the operation of which is dependent on the happening of a contingency fixed therein, and that such contingency may consist of the determination of some fact, even if said

fact is determined by private individuals. Illustrative thereof is sec. 133.25, Stats., known as the "Fair Trade Act," and see *Weco Products Co. v. Reed Drug Co.* 225 Wis. 474, 274 N. W. 426. In *State ex rel. Broughton v. Zimmerman,* 261 Wis. 398, 414, 52 N. W. (2d) 903, we quoted Mr. Chief Judge REDFIELD speaking for the Vermont court in *State v. Parker,* 26 Vt. 357, 364. In discussing this rule, he declared:

"Congress passes laws, almost every session, whose operation is made contingent upon the revenue laws of foreign states, or their navigation laws or regulations, and upon a hundred other uncertainties, more or less affected by the will or agency of voluntary beings or communities; and in most of these cases the suspension or operation of the enactment depends ultimately, perhaps, upon the mere will and agency of our executive government; and of the perfect regularity and constitutionality of such enactments no question was ever made. Numerous other instances may be found where statutes have been made dependent upon future contingencies, not only for the time of their coming in force, but for their very vitality; and no question of their validity has ever been made upon that ground. This is all recognized as sound law and established precedent by those courts and by those judges who have attempted to argue that a law, made dependent upon a popular vote, was different in principle from one dependent upon other contingencies. But all such attempts seem to me altogether illusory, and, to some extent, captious, not to say frivolous.

"If the operation of a law may fairly be made to depend upon a future contingency, then, in my apprehension, it makes no essential difference what is the nature of the contingency, so it be an equal and a fair one, a moral and legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one."

The rule is recognized in many states and is stated as follows in an annotation in 79 L. Ed. 481:

"It is not necessary for the legislature to ascertain the facts of, or to deal with, each case. Since legislation must often be adapted to complex conditions involving a host of details with which the legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the legislature the necessary resources of flexibility and practicality, enabling it to lay down policies and establish standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature shall apply. Without this power, legislatures would often be faced with the anomaly of possessing a power over a given subject, but being unable to exercise it.

"As stated in a leading Pennsylvania case: 'Then the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the lawmaking power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' " Citing Locke's Appeal, 72 Pa. 491, 13 Am. Rep. 716.

This case was cited with approval in *Union Bridge Co. v. United States,* 204 U. S. 364, 383, 27 Sup. Ct. 367, 51 L. Ed. 523.

Another illustration of the use of this rule appears in statutes providing for the licensing of members of various professions, such as doctors, dentists, and lawyers. As Mr. Justice DODGE, speaking for the court in *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 440, 87 N. W. 561, pointed out: "As early as 1818 Massachusetts recognized the diploma of Harvard Medical School, or the approval of the State Medical Society, as a proper ground of classification for practice of medicine, and was upheld in so doing by the supreme court of that state, . . . *Hewitt v. Charier,* 16 Pick. 353. See also - *Wright v. Lanckton,* 19 Pick. 288." Mr. Justice DODGE said

further: "Maine recognized approval of the Maine Medical Association as a ground of classification, and the law has been sustained by the courts, though without debate on the question now in hand. *Bibber v. Simpson,* 59 Me. 181. Alabama admits on the faith of a certificate from the Medical Association of the State of Alabama, also on diploma of any medical college in the United States, and the constitutionality of the law has been declared. *Brooks v. State,* 88 Ala. 122. Indiana distinguishes applicants approved by the State Dental Association. *Wilkins v. State,* 113 Ind. 514. Several states make the fact of practicing therein at the date of the law a sufficient reason for exemption from examination. *State v. Creditor,* 44 Kan. 565. Maryland finds a legitimate distinction between graduates of a 'university or college authorized to grant diplomas in dental surgery' and those of 'a regular college of dentistry.' *State v. Knowles,* 90 Md. 646, 656."

In *Ex Parte Gerino,* 143 Cal. 412, 418, 77 Pac. 166, the court said:

"It being proper for the legislature to demand some standard of efficiency, as we have seen, we think it is equally within its powers to declare that it shall be the same as that prescribed from time to time by an association composed of colleges devoted to the work of preparing persons for the profession. Evidently the standard of proficiency in scholarship as a preparation, and the particular studies necessary to secure a fair preparation, must change as the discoveries in natural science open new fields of investigation and suggest or reveal new curative agencies. The legislature cannot successfully prescribe in advance a standard to meet these new and changing conditions. The method adopted appears to be sufficiently definite to enable all colleges to reach the required standard when in good faith they desire to do so. The law is as fixed, definite, and certain in this respect as the nature of the subject and the object to be attained will permit, and we do not think it should be held void because it adopts the standard fixed from time to time by those who, it will be presumed, are the most eminent in the profession which it attempts to regulate,

and who should be the most interested in maintaining the highest degree of professional proficiency, skill, and training." See also *State v. Hynds,* 61 Ariz. 281, 148 Pac. (2d) 1000; *Jones v. Board of Medical Examination,* 111 Kan. 813, 208 Pac. 639.

The United States Pharmacopoeial Convention is as broadly and truly representative of the medical and pharmaceutical professions as the institutions relied on in enactments that application for medical or dental licenses must meet current standards of practice set by medical or dental schools or associations. The cases which have reached final determination and the texts upon the subject hold to the effect that the United States Pharmacopoeial Convention is an institution now firmly fixed in the circumstances of medical and pharmaceutical planning for the protection of the public; and it appears that its publications, the United States Pharmacopoeia and its supplements reflect the integrity and high standards of the convention. In the present case we have a complete act of the legislature which was not, at the time of its passage, dependent on the act of any other person or organization, but provided for the inclusion of articles discovered in the future with the advancement of science. It should not be held void because it provides for the inclusion of new discoveries, if approved by persons most eminent in the profession who are most interested in maintaining the highest standards known or to be known to science. This is not a case of the delegation of legislative powers. The publications referred to in the statute are not published in response to any delegation of power, legislative or otherwise, by the statute. The compendia are published independently of the statute and not in response to it. These books were published before the enactment of our statute and for an entirely different purpose. Because of the eminence of the compilers, these books have been recognized as standards by the congress of the United States and by the legislatures of all forty-

eight states, at least, as far as the United States Pharmacopoeia is concerned.

The trial court, in its opinion, relied mainly on *State ex rel. Wis. Inspection Bureau v. Whitman*, 196 Wis. 472, 220 N. W. 929, and *Gibson Auto Co. v. Finnegan*, 217 Wis. 401, 259 N. W. 420. These cases and the others cited are clearly distinguishable as to the facts and as to the law. Nothing we have said herein will conflict in any way with what was said in those cases. We are here dealing with an entirely different rule.

The defendant also contends that sec. 151.06, Stats., is unconstitutional because it is vague and indefinite, and because it is arbitrary and discriminatory and thus deprives the defendant of property without due process of law and denies him the equal protection of the law. There is nothing persuasive in the arguments he advances. His contentions were inferentially dismissed by the trial court, and we will not burden this opinion with any detailed discussion of them. The statute is not unconstitutional for any of the reasons advanced by the defendant.

*By the Court.*—Order reversed and cause remanded with instructions to reinstate the complaint and for further proceedings according to law.