THE PROPRIETARY ASSOCIATION, AN UNINCORPORATED ASSOCIATION, ET AL., PLAINTIFFS-RESPONDENTS, v. BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-APPELLANTS.

Argued May 3, 1954—Decided June 21, 1954.

Mr. *Joseph H. Stamler*, Special Deputy Attorney-General, argued the cause for the appellants (*Mr. Grover C. Richman, Jr.*, Attorney-General of New Jersey, attorney).

Mr. *James F. Hoge* of the New York Bar argued the cause for the respondents (*Mr. Thomas J. Brogan*, attorney; *Messrs. George M. Chapman* and *William F. Weigel* of the New York Bar, of counsel).

The opinion of the court was delivered by

JACOBS, J. The Law Division granted, *inter alia,* the plaintiffs' prayer for a declaratory judgment defining the phrase "patent or proprietary medicines" in *R. S.* 45:14–29. See 27 *N. J. Super.* 204 (1953). The appeal taken by the defendants to the Appellate Division was certified to this court under *R. R.* 1:10–1.

New Jersey's Pharmacy Act (*R. S.* 45:14–1 *et seq.*) directs that drugs, medicines and poisons shall be sold only under the personal supervision of a registered pharmacist, but contains an express exception in favor of the making and vending of nonpoisonous patent or proprietary medicines. See *R. S.* 45:14–29. Unlike modern statutes in many other states it contains no legislative definitions or listings of illustrative patent or proprietary medicines. Heretofore our courts have had occasion to determine whether particular items came within the restrictive provisions of the act or within the general exception; in each instance the court exercised its judicial function in traditional fashion by passing upon the actual case before it without more. Thus in *Crescent Bottling Works v. Board of Pharmacy,* 121 *N. J. Eq.* 237 (*E. & A.* 1937), "Duke's Magnesia Sitro-Tartrate" was held to be a drug or medicine which was outside the statutory exception; in *Board of Pharmacy v. Hutchin,* 10 *N. J. Misc.* 641 (*Sup. Ct.* 1932), essence of peppermint and sweet spirits of nitre were held to be medicines saleable only under the supervision of a pharmacist; in *Kratky v. Board of Pharmacy,* 7 *N. J. Misc.* 970 (*Sup. Ct.* 1929), there was a similar holding with respect to camphorated oil and essence of peppermint; and in *Board of Pharmacy v. Abramoff,* 6 *N. J. Misc.* 437 (*Sup. Ct.* 1928), camphorated oil in closed containers bearing the imprint of a licensed pharmacist was held to be not saleable by a grocer or other ordinary tradesman. In *Board of Pharmacy v. Braunstein,* 2 *N. J. Misc.* 454 (*Sup. Ct.* 1924), the imposition of a penalty upon a grocer for selling tincture of iodine was sustained; and in *Board of Pharmacy v. Morhauser,* 96 *N. J. L.* 16 (*Sup. Ct.* 1921), a penalty for the sale of "Lysol" in premises not supervised

by a pharmacist was likewise sustained. In *Board of Pharmacy v. Quackenbush*, 22 *N. J. Misc.* 334 (*C. P.* 1940), "Vitamin Plus" was held by Judge Davidson to be a food rather than a medicine and therefore saleable in the defendant's department store; but see *Culver v. Nelson*, 237 *Minn.* 65, 54 *N. W. 2d* 7 (1952), where the Minnesota Supreme Court held that the vitamins at issue before it were neither ordinary foods nor proprietary medicines but were medicines saleable only under the supervision of pharmacists.

█ Notwithstanding the foregoing, the plaintiffs in the instant matter chose not to seek any adjudication with respect to any particular item; on the contrary, they simply prayed that the court define the meaning of "patent medicines," "proprietary medicines" and "domestic remedies," although the prayer with respect to "domestic remedies" was later withdrawn. In its opinion (27 *N. J. Super.*, at *p.* 218) the Law Division defined patent and proprietary medicines to mean:

"Completely compounded packaged drugs, medicines and non-bulk chemicals which are held out for sale and sold by or under the authority of the proprietor thereof directly to the general public and the packages of which drugs, medicines and non-bulk chemicals bear, or are accompanied by, printed matter specifying affections, symptoms or purposes for which the remedies are recommended and the directions for their use, and with respect to which ownership is claimed or asserted by the proprietor thereof as to name, composition or process of manufacture, by secrecy, patent, trademark, copyright, or in any other manner which may be the basis for legal action by the proprietor with respect to said drugs, medicines and non-bulk chemicals in any of the courts of this state."

The defendants contend that this definition gives rise to uncertainties and controversies which will entail new and extensive litigation, and they point to conflicting opinions among the plaintiffs' own witnesses as to whether particular items fall within the definition as originally proposed by the plaintiffs and as largely adopted by the Law Division. We incline to the view that the definition is so sweepingly broad as to embrace all drugs and medicines sold directly to the general public so long as they are compounded and packaged

in original containers which bear specifications of their purposes and directions for their use and the private labels of their manufacturers or distributors. Thus viewed, it would nullify earlier court decisions such as *Crescent Bottling Works v. Board of Pharmacy, supra,* where Duke's Magnesia Sitro-Tartrate was held to be an adulteration of milk of magnesia and saleable only under the supervision of pharmacists; it is hardly conceivable that any such legislative purpose may be gleaned from *R. S.* 45:14–29 which, although a revision of earlier legislation, was enacted in December 1937, after the court decisions were rendered. In any event, we are satisfied that under the particular circumstances presented, the Law Division should not have rendered its definition and, indeed, should not have rendered any general definition unrelated to a particular item involved in a case or controversy requiring adjudication. *Cf. N. J. S.* 2A:16–61; *Johnston v. Board of Adjustment, Westfield,* 118 *N. J. L.* 298, 300 (*Sup. Ct.* 1937); *Public Service Commission of Utah v. Wycoff Co.,* 344 *U. S.* 237, 243, 73 *S. Ct.* 236, 97 *L. Ed.* 291, 296 (1952); *Wisconsin Pharmaceutical Ass'n v. Lee,* 264 *Wis.* 325, 58 *N. W. 2d* 700 (*Sup. Ct.* 1953). The important underlying problems are legislative in nature and new enactments which clearly fix our State's current social policies and embody adequate definitions are urgently needed. In the meantime, however, our courts ought confine themselves in this field to their customary function of deciding particular cases involving such individual items as may, from time to time, properly be presented for adjudication.

The record contains considerable testimony bearing on the issue as to whether the sale of drugs in original containers bearing private trade names or labels and instructions for their use should be confined to pharmacies. The defendants point out that all pharmacists have formal education and training, are obliged to meet minimum standards not only with respect to their educational training but also with respect to their drug stores, and are equipped to identify the ingredients of drugs, to answer appropriate inquiries, and to furnish cautionary information and advice. They contrast

this with ordinary retail tradesmen who need have no formal training or education and who might not be equipped to read or understand labels on packaged drugs which may contain special instructions for their keeping, important expiration dates, or listings of ingredients under unfamiliar terminology.

On the other hand, the plaintiffs contend that completely packaged medicines bearing private trade names or labels and proper directions for their use may, from society's point of view, be sold just as well in ordinary retail stores as in drug stores having pharmacists in charge. They refer, as did the Law Division, to decisions such as *State v. Donaldson*, 41 *Minn.* 74, 42 *N. W.* 781 (1889), where the Supreme Court of Minnesota in holding that "Ayer's Sarsaparilla" and "Fellows' Compound Syrup of Hypophosphites" were patent or proprietary medicines saleable anywhere, said that no skill or science was called for on the part of the seller; that anyone could make the sale so long as he could "read the label on the package and make change with the purchaser"; and that the articles could as properly "be sold by a grocer or drygoods merchant" as by a pharmacist. This view may be contrasted, however, with those expressed in later opinions of the same court. See *State v. Zotalis*, 172 *Minn.* 132, 214 *N. W.* 766 (*Sup. Ct.* 1927); *State v. F. W. Woolworth Co.*, 184 *Minn.* 51, 237 *N. W.* 817, 76 *A. L. R.* 1202 (*Sup. Ct.* 1931); *Culver v. Nelson, supra.* In the *Zotalis* case the court held that aspirin in a container bearing a label stating that it held five-grain aspirin tablets, that a dose was one or two tablets, and that it was distributed by a designated laboratory and chemical company of Minneapolis, was not a "proprietary or patent medicine" and was saleable only in pharmacies. In the course of its opinion the court acknowledged that no technical skill was required in making the sale but pointed out that "the pharmacist knows where to procure a pure and genuine article." In the *Woolworth* case the court held that milk of magnesia manufactured by Sykes-Rigney Company of Philadelphia could not be sold in the defendant's retail general store in Minneapolis where no

licensed pharmacist was employed. In discussing the role of the pharmacist in the sale of drugs and medicines in the original packages of the manufacturer, the court said [184 *Minn.* 51, 237 *N. W.* 819]:

"But the examination of the quality of medicines sold is not the sole purpose of having a pharmacist in charge. Many poisonous drugs and medicines may be sold in original packages. The pharmacist knows what drugs are poisonous. He is required to keep a record of sales of numerous poisonous preparations. If attentive to his duties, he will in some degree guard against mistakes and misuse. He must in the first instance determine whether an article called for is a poison requiring registry of the sale. He should know whether an article sold is a standard preparation made according to the United States Pharmacopoeia formula, or an adulterated and harmful preparation. If he knowingly sells an adulterated and harmful preparation, we do not believe he would be protected by the fact that it was sold in the original package."

In the *Culver* case the court held that vitamins which were sold in containers bearing the name and address of the manufacturer, the trade name of the product, and a description of the contents, were medicines (other than non-habit forming, harmless, proprietary medicines) and were saleable only in pharmacies. With respect to the qualifications of the pharmacist the court said [237 *Minn.* 65, 54 *N. W. 2d* 14]:

"Not only is a pharmacist in a better position to know where to procure a pure and genuine article, but he is equipped by training and education to know and advise prospective purchasers what products contain vitamins they seek in the best combinations. The record shows that many of the vitamins lose their strength and vitality by exposure to light or adverse temperature. A pharmacist is equipped by training to know how best to preserve the beneficial qualities of these products."

Decisions in other states have advanced varying views as to the wisdom and propriety of confining the sale to pharmacies, of drugs in original containers bearing private trade names or labels and instructions for their use. Compare *State v. Wakeen,* 263 *Wis.* 401, 57 *N. W. 2d* 364 (*Sup. Ct.* 1953), and *State ex rel. Missildine v. Jewett Market Co.,* 209 *Iowa* 567, 228 *N. W.* 288 (*Sup. Ct.* 1929), with *Department of*

*State v. Kroger Grocery & Baking Co.*, 40 *N. E. 2d* 375 (*Ind. App.* 1942), rehearing denied 41 *N. E. 2d* 952 (*Ind. App.* 1942), reversed 221 *Ind.* 44, 46 *N. E. 2d* 237 (*Ind. Sup. Ct.* 1943), and *State v. Stephens*, 102 *Mont.* 414, 59 *P. 2d* 54 (*Sup. Ct.* 1936). Subject to judicial review on constitutional issues in an appropriate proceeding (*Rescue Army v. Municipal Court*, 331 *U. S.* 549, 573, 67 *S. Ct.* 1409, 91 *L. Ed.* 1666, 1680 (1947)), the Legislature is conceded to be the proper branch of government to determine to what extent, if any, the sale of such drugs should be confined to pharmacies, and courts may not concern themselves with the policy underlying its determination. Our statutory policy is now expressed in *R. S.* 45:14–29 which, as the Law Division's discussion of the legislative history sets forth (27 *N. J. Super.*, at *p.* 210), had its beginnings in the Pharmacy Act of 1877. *L.* 1877, *c.* 133. That act, after providing for the sale of drugs and medicines under the supervision of pharmacists, stated that nothing therein shall interfere with the "making or vending of patent or proprietary medicines" nor with the sale of the usual domestic remedies by retail dealers in rural districts. It was enacted long before the imposition of current federal and state requirements for the labeling of drugs and medicines and the statement of their ingredients. *Cf.* 21 *U. S. C. A.* § 301 *et seq.; R. S.* 24:5–1 *et seq.* The patent and proprietary medicines which were then mainly in vogue were either those protected by letters patent or those whose supposedly secret ingredients formed a particular product which was the exclusive property of its manufacturer or distributor. *Cf. Rorem and Fischelis, The Costs of Medicines* (1932), *pp.* 16, 114; *Kremers and Urdang, History of Pharmacy* (1940), *p.* 323; *State v. Jewett Market Co., supra; State v. Wakeen, supra.* The Legislature then may well have contemplated that the statutory exception would be confined to such products. However, the proofs in the record suggest that the terms later came to be used more loosely to include every nonpatented or nonsecret item which was sold in the original container bearing the manufacturer's or distributor's distinctive trade name or

label and offered to the public on the basis of the "special formula, skill or care which went into its manufacture." *People v. Heron*, 34 *Cal. App. Supp.* 2d 755, 90 *P.* 2d 154, 156 (*Sup. Ct.* 1939). And the contention is advanced that such broader usage should now be considered as being within legislative contemplation when the original statutory reference to patent and proprietary medicines was carried over in later enactments culminating in the *Revision of 1937. Cf. Duke Power Co. v. Somerset Co. Bd. of Taxation*, 125 *N. J. L.* 431, 433 (*E. & A.* 1940). It is worthy of note, however, that recent decisions elsewhere tend to reject the position that long-standing statutory exceptions in favor of patent or proprietary medicines are to be construed as permitting the sale anywhere of all nonpatented and non-secret medicines and drugs so long as they are compounded and packaged in original containers bearing printed trade names or labels and directions for their use. See *Woolworth (N. Z.), Ltd. v. Wynne*, [1951] *N. Z. L. R.* 923; *State v. Wakeen, supra; Culver v. Nelson, supra.* But see *Wrigley's Stores v. Michigan Board of Pharmacy*, 336 *Mich.* 583, 59 *N. W.* 2d 8 (1953).

In the *Wynne* case the New Zealand Court of Appeal held that Vincent's Tablets, described as A. P. C., being a compound of acetyl salicylic acid, phenacetin and caffeine citrate, was not a "proprietary medicine" and was not saleable in the defendant's general store which did not have a pharmacist in charge. Judge Stanton expressed the view that the statutory reference to proprietary medicines was intended to include only those medicines which have a proprietor "not of the label or name under which the medicine is sold, but of the right of mixing or compounding the particular preparation so that it is not the common property of all the world." In the *Wakeen* case the Supreme Court of Wisconsin, in holding that aspirin, milk of magnesia and camphorated oil did not fall within a general statutory exception, concurred in the trial court's opinion which, after referring to earlier New Jersey decisions and to various judicial statements as to the meaning of "proprietary medicines," expressed the view that

if the Wisconsin Legislature had intended to permit the sale of the aforementioned items without restriction it would have listed them specifically along with other drugs enumerated in its statute. In the *Culver* case the Minnesota Supreme Court's holding, that the vitamins at issue were not proprietary medicines, was accompanied by an expression of its view that, while secrecy of the formula is not essential, "there must be some right of ownership in either the method or manner of preparation of the vitamin which constitutes the beneficial ingredient of the ultimate product," and that ownership of the trade name is not sufficient to make the drug a "proprietary." Significantly, the Minnesota Supreme Court made no attempt to formulate any comprehensive definition of proprietary medicines, stating that "while it is difficult to exactly define proprietary medicines, it is much less difficult to determine those preparations which are not proprietary medicines, and that is as far as we need go."

In *Eccles v. Peoples Bank*, 333 *U. S.* 426, 68 *S. Ct.* 641, 644, 92 *L. Ed.* 784 (1948), Justice Frankfurter pointed out that a declaratory judgment, like other forms of equitable relief, "should be granted only as a matter of judicial discretion, exercised in the public interest." And more recently in *Public Service Commission of Utah v. Wycoff Co., supra,* Justice Jackson, in an opinion for the United States Supreme Court which declined to grant a declaratory judgment as to whether the complainant's activities constituted interstate commerce, aptly said [344 *U. S.* 237, 73 *S. Ct.* 240] :

"But when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power. While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law. A maximum of caution is necessary in the type of litigation that we have here, where a ruling is sought that would reach far beyond the particular case." *Cf. Department of State v. Kroger Grocery & Baking Co., supra,* 46 *N. E. 2d* at *page* 238.

██ The courts of our State have very properly refrained from rendering advisory opinions and from "functioning in the abstract." *New Jersey Turnpike Authority v. Parsons*, 3 *N. J.* 235, 240 (1949). It is true that where there is an actual controversy there is ample jurisdiction in our courts to grant general declaratory relief (*N. J. S.* 2A:16–1 *et seq.*), but the exercise of such jurisdiction may, and generally should, be declined where the declaration will "not terminate the uncertainty or controversy giving rise to the proceeding." *N. J. S.* 2A:16–61. We incline towards the view that such is the case in the instant matter; in any event, we are convinced that the public interest and an enlightened use of the judicial function require that we not grant any part of the general declaratory relief here sought by the parties. Vital social issues are involved upon which the Legislature ought have full opportunity to express itself in the form of modern legislation which fixes the current policy of the State and embodies suitable definitions and enumerations. Pending such legislation the courts will, as heretofore, be obliged to deal, in particular cases involving individual items, with the antiquated statutory terminology which has been carried forth largely without change of dress. This may entail the danger that, notwithstanding sympathetic recognition of the doctrine of separation of powers, judicial rather than legislative judgment as to the controlling social interests will dominate; but on this score the Legislature concededly has the counterbalancing and readily available remedy.

The judgment entered in the Law Division is reversed with directions that the proceedings be dismissed, without costs.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice HEHER—1.