The STATE of Missouri at the Relation and to the Use of Dr. Robert Lee GIBSON, Potosi, Missouri, Appellant,

v.

The MISSOURI BOARD OF CHIROPRACTIC EXAMINERS, Dr. Arch G. Campbell, Member and Chairman of Said Board, Dr. Lial J. Shaw, Member of Said Board, and Dr. Durham, Secretary and Member of Said Board, Dr. Eugene Silver, Member of Said Board, and Dr. Dudley Ruopp, Member of Said Board, Respondents.

No. 23733.

Kansas City Court of Appeals.

Missouri.

Feb. 4, 1963.

Samuel Richeson, Dearing, Richeson & Weier, Hillsboro, for appellant.

Thomas F. Eagleton, Atty. Gen., John H. Denman, Asst. Atty. Gen., Jefferson City, for respondents.

HUNTER, Judge.

This is an appeal from a judgment of the Circuit Court of Cole County in an action for certiorari to review the action of the State Board of Chiropractic Examiners, respondents, in revoking the license of relator, Robert Lee Gibson, a chiropractic doctor.

On February 25, 1961, an action was commenced against relator by the State Board of Chiropractic Examiners by the filing and serving of a complaint and notice of hearing in which relator was charged with having on January 23, 1961, in the City of Potosi, Missouri, "illegally exceeded the authority granted to you under said license (chiropractor's) in that you prescribed medicine to one Lonnie Ray Callahan, a child of five years of age, and administered said medicine to Lonnie Ray Callahan by placing a quantity of liquid into his ear and prescribed and furnished other medicines to be taken internally by the said Lonnie Ray Callahan, in the presence of his mother, Mrs. Lynn Callahan and Mrs. Charlotte Henry, all of which is illegal and in violation of Section 331.010 RSMo. 1949."

A hearing on this complaint was held in Jefferson City on March 29, 1961, at which relator appeared with his attorney. As a result of the hearing the Board found:

"(3) That on or about the 23rd day of January, 1961, the Respondent did, at his office in the City of Potosi, County of Washington, State of Missouri, undertake to treat Lonnie Ray Callahan, at that time five years of age, for an ailment which represented to Respondent as an earache; that Respondent, at the time and place aforesaid, prescribed medicine to the said Lonnie Ray Callahan and administered medicine to Lonnie Ray Callahan by placing a quantity of liquid into his ear.

"(4) That, at the time and place aforesaid, Respondent prescribed and furnished to Lonnie Ray Callahan other drugs and medicines by giving them to Mrs. Lynn Callahan, mother of Lonnie Ray Callahan, there present; and that respondent instructed Mrs. Lynn Callahan as to the administration of said drugs and medicines.

"(5) That respondent charged a fee of two dollars and fifty cents ($2.50) for his treatment of Lonnie Ray Callahan on or about the 23rd day of January, 1961, and that Respondent, through his agent, accepted payment of that fee from Mrs. Lynn Callahan;

"(6) That at no time during his treatment of Lonnie Ray Callahan on or about the 23rd day of January, 1961, did Respondent practice on said Lonnie Ray Callahan the science and art of palpating and adjusting by hand the movable articulations of the spinal column for the correction of the cause of abnormalities and deformities of the body."

The Board then made certain conclusions of law including

"(1) That Respondent's treatment of Lonnie Ray Callahan as described in Findings of Fact 3 through 6 was in excess of the authority granted to him as a chiropractor licensed under the laws of the State of Missouri;

"(2) * * * That Respondent's acts of prescribing and administering drugs as described in Findings of Fact 3 and 4 are in violation of Section 331.010, RSMo. 1959, and, as such, constitutes illegal or immoral actions as proscribed by Section 331.060(2), RSMo. 1949;

"(3) That Respondent's acts as described in Findings of Facts, 3 through 6, constitute deception or fraud in the practice of chiropractic as proscribed by Section 331.060 (2), RSMo. 1959;

"(4) * * * That Section 331.060, RSMo. 1959, authorizes the State Board of Chiropractic Examiners to revoke the license of a chiropractor, if upon a hearing, it is proven beyond a reasonable doubt to the Board that the Respondent is guilty of immoral or illegal action or in any way guilty of deception or fraud in the practice of chiropractic;

"(5) * * * The Board concludes that, by reason of the Findings of Fact set out above *and each of them,* the Respondent is guilty of immoral or illegal action or guilty of deception or fraud in the practice of chiropractic; and that for such immoral or illegal action and for such deception or fraud in the practice of chiropractic on the part of Respondent, *and each of the acts aforesaid,* the license and renewal certificate of the Respondent should be revoked." (Emphasis ours.)

The Board ordered the revocation. On certiorari, the Circuit Court of Cole County, Missouri, affirmed the Board's order.[1] This appeal followed.

 The State Board of Chiropractic Examiners is a duly created legal entity, consisting of five persons. Section 331.090 RSMo 1959, V.A.M.S. (All future statutory references are to V.A.M.S.) The board, rather than its individual members, is the real party in interest and is a necessary party. It is the law that where a legal entity or quasi public corporation is the real party, the fact that its component members are named parties does not vest the Supreme Court with jurisdiction under Article V, Section 3, of our State Constitu-

tion, even though such members are state officers. State ex rel. Gehrs v. Public Service Commission of Missouri, 338 Mo. 177, 90 S.W.2d 390; State ex inf. Wallach v. Schneider's Credit Jewelers, Mo.App., 243 S.W.2d 125. Hence, jurisdiction of the appeal lies in this court.

On this appeal four contentions of error are presented. Appellant first contends there was not sufficient competent evidence in the record to support the charge and finding that he illegally exceeded the authority granted him under his chiropractor's license "in that you prescribed medicine and administered medicine * * * by placing a quantity of liquid into (Callahan's) ear and prescribed and furnished other medicine to be taken internally * * * in violation of Section 331.010."

The undisputed evidence is that on January 23, 1961, Mrs. Viola Callahan took her then five year old son, Lonnie Ray, to appellant's office in Potosi, Missouri. The boy was crying because of pain in his left ear. Appellant examined the child's ear with an instrument that had a light in it, and stated his diagnosis as a mastoid ear. He then announced to the mother and aunt, Mrs. Henry, both of whom were present throughout the entire visit, that he was going to put drops in the boy's ear to kill the pain. He put three drops into the boy's ear, using an eye dropper. Appellant then gave the boy two packages of pills and directed the mother to "give him one of the white ones and one of the yellow ones * * * every three hours". He also gave the mother a bottle of ear drops, telling her to "put three of them in at a time and if that doesn't do, put five drops in his ear." According to both the mother and the aunt, at no time in his treatment of Lonnie Ray did Dr. Gibson massage any portion of the boy's body, and touched him only while he was looking in the boy's ear

---

1. Section 331.070 provides, "The board shall have power to determine all matters herein placed within its jurisdiction, and its determination shall be final and conclusive, except that such determination may be reviewed by the circuit court of the county in which the state board of examiners has its principal office, by writ of certiorari."

and when he administered ear drops. There was testimony by appellant and his wife that appellant did give the boy a neck adjustment. Appellant then charged $2.50 for treatment of Lonnie Ray Callahan, and that amount was subsequently paid to him in cash by Mrs. Callahan, who received a receipt for it. Appellant at the hearing stated with reference to the ailing ear, "it has been customary for me to treat those conditions * * *. We had a complete course of eye, ear, nose, and throat, complete semester of it (in school) * * * and the type of treatment is the same as I did for the child other than I also used a cervical adjustment on the child." Appellant stated that although the boy was in pain there was no emergency existing; that there was another chiropractor, two osteopaths and two medical doctors in Potosi.

Upon chemical analysis the glycerin ear drops also contained a small amount of benzocaine, a chemical which, when applied to the surface of the skin, acts as a local anesthetic, and also small amounts of alcohol, water, chloroform and ether in an oil base. Appellant stated the yellow tablets were "placebos", or a neutral substance, and the white tablets were Vitamin B-1 tablets —that "a placebo is a blank little tablet which * * * you use it for psychological effects" ; and that the reason he gave the boy the placebo pills was to induce him to take the vitamin pills. He stated the vitamin pills were for nutritional purposes and that there was no relationship between the vitamins and the otitis media but that the boy looked like he could use some vitamins. On cross-examination appellant stated his diagnosis was otitis media, or inflamation of the middle ear; that he was trained in treating such conditions in his chiropractic studies, and that his text books said to use a solution of phenolglycerin, but his treatment was glycerin or any other oil solution.

Section 331.010 RSMo 1959, reads:

"Defining practice of chiropractic

"The practice of chiropractic is hereby defined to be the science and art of pal-

pating and adjusting by hand the movable articulations of the human spinal column, for the correction of the cause of abnormalities and deformities of the body. It shall not include the use of operative surgery, obstetrics, osteopathy, nor the administration or prescribing of any drug or medicine. The practice of chiropractic is hereby declared not to be the practice of medicine and surgery or osteopathy within the meaning of chapter 337, RSMo., and not subject to the provisions of said chapter."

Appellant's reasoning in connection with his first charge of error is that the ear drops, vitamins and pills he prescribed and administered are not "the administration or prescribing of any drug or medicine" as set out in Section 331.010. He contends the benzocaine in the ear drops being only about ⅒₅ of the quantity required for medical effect and which could have come from contamination of the bottle does not make the ear drops "medicine" ; that the vitamins, ear drops and placebo pills are items obtainable by the public without prescription and are not medicine. He urges the view that a chiropractor should not be prevented "from doing such things as placing a splint on a broken bone, advising the soaking of a swollen or inflamed part in hot water, applying ointment or a bandage to a burn, or using any other commonly accepted remedies, not requiring any particular art, science or skill, and commonly used in the treatment and relief of minor ills. * * * These materials are certainly not such a part of the medical profession as to constitute practice of medicine through their use, recommendation and application * * *."

Appellant's self serving view expressed above is not sound, and is contrary to the plain terms of the statute, Section 331.010. Appellant overlooks the fact that the legislature, having in mind the necessary qualifications and training involved, in its wisdom and for the protection of the public has carefully limited the scope of a chiropractor's license to "the science and art of palpating and adjusting by hand the movable

articulations of the human spinal column, for the correction of the cause of abnormalities and deformities of the body." It has specifically denied to chiropractors license to administer or prescribe any medicine or drug or to practice medicine generally.

This is not the case of a housewife, parent or other individual applying medication. This is the case of a professional man, a doctor of chiropractic, *as a part of his profession* and for which he makes a charge, examining a patient, making a diagnosis and prescribing and administering ear drops, vitamins and pills. The relationship of doctor of chiropractic and patient existed throughout and what was done was purportedly performed as a part of that relationship and not on a nonprofessional basis.

■ It is our view that the ear drops, vitamins and pills prescribed and administered as they were by a doctor of chiropractic, in his professional capacity to his ailing patient for which he expected to make a charge for his professional services, are "medicine" within the plain meaning of Section 331.010 above quoted.

■ It is well known that many medicines are obtainable by the public without the necessity of having a prescription, and the fact that an item is obtainable by the public without prescription does not mean that it is not medicine or a drug. See, State v. Jones, 237 Mo.App. 714, 164 S.W.2d 85; 17A Am.Jur., Drugs and Druggists, Sec. 3, page 510. For some of the cases holding items to be drugs or medicine although they could be purchased without prescription, see State ex rel. Missildine Co. v. Jewett Market Company, 209 Iowa 567, 228 N.W. 288 (aspirin); State v. Baker, 229 N.C. 73, 48 S.E.2d 61 (tonics and laxatives); State v. Bresce, 137 Iowa 673, 114 N.W. 45 (tissue food); Board of Pharmacy of State of New Jersey v. Hutchin, 10 N.J.Misc. 641, 160 A. 214 (essence of peppermint and sweet spirits of niter); People v. Arthur, 1 Cal.App.2d Supp. 768,

32 P.2d 1002 (hydrogen peroxide); United States v. Grayce, Inc., D.C., 126 F.Supp. 6 (Vaginal suppositories); United States v. 48 Dozen Packages, Etc., 2 Cir., 94 F.2d 641 (gauze bandages); United States v. 3 Cartons, Etc., D.C., 132 F.Supp. 569.

The Oxford English dictionary defines "medicine" as "any substance or preparation used in the treatment of disease; also medicaments generally." "Medicine" is defined in 57 C.J.S. Medicine page 1042, "* * * the word signifies a drug, indicating nothing more than a remedial agent that has the property of curing or mitigating diseases, or is used for that purpose, and in its ordinary sense, as applied to human ailments, it means something which is administered, either internally or externally, in the treatment of disease or the relief of sickness. * * *

"There are many things, not in themselves medicines, but which may be put to a medicinal use, and when so used they may become medicines. * * * The fact that the substance employed as a remedial agent may have value as a food, and a tendency to build up and restore wasted or diseased tissue, will not deprive it of its character as a 'medicine,' if it is administered and employed for that purpose. * * *" See, also, Stribling v. Jolley, 241 Mo.App. 1123, 253 S.W.2d 519, 525; State v. Jones, supra; Harris v. State, 229 Miss. 755, 92 So.2d 217(8).

In 17A Am.Jur., Drugs and Druggists, Sec. 6, page 511, it is stated, "* * * whether a vitamin preparation is a drug or a food is ordinarily a question of fact. The same substance may be a drug under one set of circumstances, and not a drug under another. The test is whether it is administered or employed as a medicine."

In Culver v. Nelson, 237 Minn. 65, 54 N.W.2d 7, 11, the court stated, "That vitamins are used internally for the cure, mitigation, treatment, or prevention of disease in man cannot well be subject to serious doubt. Even plaintiff's experts agree that

a vitamin deficiency is or may be a disease and that when vitamins are prescribed for the treatment of such a disease it is as a drug."

In Harris v. State (Miss.), supra, a chiropractor was found guilty of practicing medicine without a license. His defense was that the injection used was only vitamins, and that they were injected to correct a vitamin deficiency. In ruling that defendant came within the statutory definition of practicing medicine the court said, " * * * a substance which is administered for the purpose of restoring vitamin deficiency and which has the effect of restoring wasted tissue is a remedial agent, and one for the prevention of disease, and, therefore, one akin in character to medicine and one within the statutory definition of practicing medicine."

The purpose of the ear drops was to alleviate the pain and to permit and aid the ear to heal, and were prescribed and administered in a professional capacity by appellant to his patient. As we view it, even the so-called "placebo" pills were administered and prescribed as a medicine. So far as the patient and his family knew these pills were a part of the treatment and were received for that purpose. If the pills were used for psychological effect, or to make the patient feel better, or to aid in the treatment generally of the boy their professional prescription and administration may be considered to be that of a medicine.

Appellant next contends the administration of the medicine under the described circumstances is not ground for the revocation of a chiropractic license as not being one of the specific grounds for revocation named in the statute. However, we are unable to find any merit in this contention. Section 331.010 defines the practice of chiropractic and in effect forbids the administration or prescribing of any drug or medicine as a part of that practice. Section 334.010 provides, "It shall be unlawful for any person not now a registered physician within the meaning of the law to

practice medicine * * * or to profess to cure and attempt to treat the sick and others afflicted with bodily or mental infirmities * * * except as herein provided." Chiropractic practice as defined in Section 331.010 is of course permitted to chiropractors for Section 334.155 excepts chiropractors "licensed and lawfully practicing their profession within the provisions of chapter 331, RSMo." Section 334.250 provides those who violate Section 334.010 are guilty of a misdemeanor. Section 331.060 makes it the duty of the board to investigate all charges of "immoral or illegal actions" with respect to chiropractors, "and if upon such hearing it shall be proven beyond a reasonable doubt to the board, that the accused is guilty of such immoral or illegal action * * * or in any way guilty of deception or fraud in the practice of chiropractic * * * or is guilty of any criminal or illegal actions, the board shall revoke his license."

It is clear that the practice of medicine by a chiropractor beyond that permitted him under Section 331.010—to engage in "the science and art of palpating and adjusting by hand the movable articulations of the human spinal column, for the correction of the cause of abnormalities and deformities of the body"—is illegal and is a sufficient ground for the revocation of his chiropractic license. The administration and prescribing of any drug or medicine by a chiropractor in his professional capacity to a patient is an unauthorized act and beyond the scope of his chiropractic license, hence is illegal within the meaning of Section 331.060. The legislature in its wisdom has prohibited such conduct and in the public interest has made it a ground for revocation of the chiropractic license.

Appellant's third contention is that the conclusions of law upon which the revocation is made are in the disjunctive, and do not reveal whether the revocation is based upon administration of medicine, or because he was guilty of deception or fraud in charging a fee and not giving a chiropractic adjustment, or possibly some other

act not charged or proved. This contention also is not meritorious. A fair reading of the charge upon which appellant was tried and the findings of fact and conclusions of law as made by the Board clearly shows the basis of the board's action in revoking the license was appellant's action in unlawfully exceeding his authority granted him as a licensed chiropractor by prescribing and administering drugs to Lonnie Ray Callahan at the time, place and in the manner described. While the Board also characterized such acts. as "immoral actions" that "constitute deception or fraud in the practice of chiropractic" these characterizations may be treated as mere surplusage and not necessary to the sustaining of the charge. In so saying we do not intend to indicate that appellant's acts were erroneously characterized, but only that there is no need in this opinion to examine them in that regard, a sufficient ground for revocation already having been established by the evidence and declared by the Board.

Appellant also says the findings and conclusions of the Board are broader than the charge. These findings and conclusions are sufficiently responsive to and in accordance with the charge as is readily discernible upon their examination.

 In conclusion, the evidence is such as to permit the State Board of Chiropractic Examiners to find beyond a reasonable doubt that appellant, as charged, unlawfully exceeded the authority granted him under his chiropractic license. State ex rel. St. Louis Public Service Co. v. Public Service Commission, 365 Mo. 1032, 291 S.W.2d 95. Having so found, that Board had the statutory power to revoke appellant's chiropractic license.

We have examined all the contentions of error made by appellant in his brief and have found them not meritorious. The judgment of the circuit court, affirming the Order of the Board, should be and is affirmed.

All concur.