Filed 4/19/18

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MONSANTO COMPANY,<br><br>　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT et al.,<br><br>　　Defendants and Respondents;<br><br>CALIFORNIA CITRUS MUTUAL et al.,<br><br>　　Interveners and Appellants;<br><br>CENTER FOR FOOD SAFETY et al.,<br><br>　　Interveners and Respondents. | F075362<br><br>(Super. Ct. No. 16CECG00183)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Arnold & Porter Kaye Scholer, Trenton H. Norris, Sarah Esmaili and S. Zachary Fayne for Plaintiff and Appellant.

Law Office of Peg Carew Toledo and Peg Carew Toledo for California Chamber of Commerce and Civil Justice Association of California; Gregory Herbers for Washington Legal Foundation as Amici Curiae on behalf of Plaintiff and Appellant.

Kahn, Soares & Conway, George H. Soares, Ann M. Grottveit and Carly A. Cardenas for Interveners and Appellants California Citrus Mutual, Western Agricultural Processors Association, California Cotton Ginners and Growers Association, California Grain and Feed Association, Almond Alliance of California, and Western Plant Health Association.

Xavier Becerra, Attorney General, Susan S. Fiering, Dennis A. Ragen, Heather C. Leslie and Laura J. Zuckerman, Deputy Attorneys General, for Defendants and Respondents.

Selena Kyle; Altschuler Berzon, Stephen P. Berzon, Jonathan Weissglass and Connie K. Chan; James R. Wheaton, Lowell Chow, Nathaniel Kane; Adam F. Keats and Ryan Berghoff for Interveners and Respondents Sierra Club, Natural Resources Defense Council, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Environmental Law Foundation and Center for Food Safety.

-ooOoo-

Appellants,[1] led by Monsanto Company and including intervenors California Citrus Mutual, Western Agricultural Processors Association, California Cotton Ginners and Growers Association, California Grain and Feed Association, Almond Alliance of California, and Western Plant Health Association, appeal from a trial court order and judgment dismissing appellants' petition for writ of mandate and complaint. They are supported by amicus briefing from the California Chamber of Commerce and Civil Justice Association of California, as well as from the Washington Legal Foundation. Respondents consist of the Office of Environmental Health Hazard Assessment (Office) and its director, Lauren Zeise, in her official capacity, along with intervenors Sierra Club;

_____

[1] Throughout this opinion, we generally refer to the parties as appellants and respondents, regardless of whether only one or a few of the individual parties are acting. To the extent any individual appellant or respondent's actions are relevant we will identify them separately.

2.

Center for Food Safety; National Resources Defense Council; Environmental Law Foundation; and United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

At the heart of this case is a singular assertion. Appellants believe it is improper for a foreign entity, unaccountable to the citizens of California, to determine what chemicals are known to the state to cause cancer. In opposition, respondents contend the electorate has already decided the state should not be the sole entity to identify potential carcinogens and have, within the bounds of the law, chosen to rely on the pre-existing and continuing work of an internationally recognized and world-government funded entity to identify potential carcinogens. Within the framework of these positions, we are tasked with considering whether Proposition 65's reliance on the International Agency for Research on Cancer (the Agency) to identify known carcinogens violates various provisions and doctrines of the California and United States Constitutions. Below, the trial court concluded appellants had failed to state a claim under any of the theories they pursued. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case reaches us following the trial court's decision to grant a demurrer and motion for judgment on the pleadings. As such, the factual record in this case is limited. We note this at the outset to clarify that the following facts are generally taken from the operative complaint. To the extent background information regarding the relevant statutory or regulatory schemes is relevant, such information is provided in our discussion of the issues arising in this case.

According to the complaint, glyphosate is a widely used herbicide manufactured and marketed by Monsanto. Most people would likely recognize it from Monsanto's Roundup product line, although the chemical is registered for use in more than 160 countries.

3.

Since its introduction in 1974, glyphosate has been studied multiple times and by multiple groups to determine its potential as a carcinogen.  Regulatory bodies reviewing these studies include the Environmental Protection Agency, the German Federal Institute for Risk Assessment, the European Food Safety Authority, the European Commission, and the Canadian Pest Management Regulatory Authority.  Prior to the instant case, these groups have uniformly failed to identify glyphosate as carcinogenic.  The Office itself conducted two different risk assessments for glyphosate, in 1997 and 2007.  In both instances, Office staff members and scientists reviewed several carcinogenicity studies involving animals and concluded there was no evidence that glyphosate causes cancer.

In 2014, the Agency undertook its own review of the carcinogenicity of glyphosate.  The Agency "is a specialized cancer agency of the WHO [World Health Organization] that is based in Lyon, France."  It is funded by the governments of 25 countries, including the United States, as well as by grants.

One of the Agency's activities involves the publication of Monographs. Monographs review and summarize scientific research on the carcinogenicity of various chemicals.  In conducting these studies, the Agency's focus is upon cancer hazards, " 'even when risks are very low at current exposure levels.' "  In other words, Monographs review whether an agent is capable of causing cancer but do not consider the likelihood cancer will occur.

The Agency creates its Monographs through working groups.  Working groups are made up of between 10 and 30 Agency-selected private sector scientists that are knowledgeable about one or more of the chemicals under review.  These working groups then review a specified type of scientific data—roughly summarized as published scientific studies and publicly available government data—and ultimately classify the reviewed chemicals.  These classifications include:  carcinogenic to humans (Group 1), probably carcinogenic to humans (Group 2A), possibly carcinogenic to humans (Group 2B), not classifiable as to its carcinogenicity to humans (Group 3), and probably

4.

not carcinogenic to humans (Group 4.)  The data relied upon to make these classifications is further categorized as "sufficient evidence of carcinogenicity; limited evidence of carcinogenicity; inadequate evidence of carcinogenicity; and evidence suggesting lack of carcinogenicity."  According to the complaint, there are several alleged errors in the processes and procedures utilized to form working groups and under which the working groups operate.

With respect to glyphosate, a group of 17 scientists reviewed published literature and concluded glyphosate was " 'probably carcinogenic to humans' (Group 2A)."  This determination was based on findings in four specific animal studies that the working group concluded showed sufficient evidence of carcinogenicity.  Each of these studies or a summary thereof were specifically reviewed by the Office when it had previously concluded that glyphosate is " 'unlikely to pose a cancer hazard to humans.' "  Moreover, according to appellants, these studies had been reviewed in the course of 17 different analyses by other groups, all of which reached the opposite conclusion reviewing the data, "namely, that the small number of tumors observed in rodents subjected to treatment with glyphosate in these studies were *not* related to glyphosate."  Regardless of this conflict, the Agency's determination was published in a 2015 Monograph.

Following publication of the 2015 Monograph, the Office published a "Notice of Intent to List" glyphosate as a substance known to the state to cause cancer under the requirements of Proposition 65.  Under the law and its regulations, the Office concluded the 2015 Monograph publication brought glyphosate within the listing requirements.  As the Office stated, " 'Because these are ministerial listings, comments should be limited to whether [the Agency] has identified the specific chemical or substance as a known or potential human or animal carcinogen.  Under this listing mechanism, [the Office] cannot consider scientific arguments concerning the weight or quality of the evidence considered by [the Agency] when it identified these chemicals and will not respond to such comments if they are submitted.' "

In January 2016, appellants responded, in part, by filing a petition for writ of mandate and complaint for preliminary and permanent injunctive and declaratory relief to stop this listing determination. They subsequently filed a first amended complaint, which remains the operative pleading. Respondents filed a motion for judgment on the pleadings and demurrer to the complaint. Following briefing and argument, the trial court granted the motion for judgment on the pleadings and sustained the demurrer, finding appellants had not stated facts sufficient to support any asserted claims against respondents.

This appeal timely followed.

## DISCUSSION

As briefly alluded to above, this case is essentially a series of attacks on a specific aspect of Proposition 65, its reliance on Labor Code section 6382, subdivision (b)(1), to identify chemicals known to the state to cause cancer. Consistent with the briefing, we will refer to this mechanism as the Labor Code listing mechanism.[2] Accordingly, a brief overview of Proposition 65 and its incorporation of a portion of the Labor Code will help to clarify the framework within which this opinion operates. It is noteworthy that Proposition 65, enacted in 1986, has resulted in prior litigation and several substantial summaries of its provisions. In fact, much of the framework relevant to this matter was recently discussed in *Brown*, *supra*, 196 Cal.App.4th 233 by our colleagues in the First Appellate District. In that case, the court concluded the Labor Code listing mechanism continues to be a required consideration when creating the list of chemicals known to the state to cause cancer. (*Brown*, at p. 260.)

---

[2] The Labor Code listing mechanism is sometimes described as including Labor Code section 6382, subdivision (d). A cancer determination by the Agency in its Monograph series may also trigger a Proposition 65 warning under this provision. (See *California Chamber of Commerce v. Brown* (2011) 196 Cal.App.4th 233, 240–242 (*Brown*) [noting that the Federal Hazard Communication Standard references the IARC Monographs in establishing a chemical is a carcinogen or potential carcinogen for hazard communication purposes].) The parties do not separately discuss this listing process and our analysis does not directly consider its implications.

"Proposition 65 imposes two significant requirements on businesses.  First, it prohibits businesses from discharging into drinking water sources any chemical 'known to the state to cause cancer or reproductive toxicity' (the discharge prohibition).  [Citation.]  Second, it requires businesses to provide a public warning if they 'knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity' (the warning requirement)."  (*Brown*, *supra*, 196 Cal.App.4th at pp. 238–239.)  The triggering mechanism for both of these requirements is "the inclusion of a chemical on the Proposition 65 list of 'chemicals known to the state to cause cancer or reproductive toxicity.' "  (*Id.* at p. 239, fn. omitted.)  Violations of these provisions result in potential lawsuits from public and private enforcers.  (*Id.* at p. 239.)

"[Health and Safety Code s]ection 25249.8 addresses the content of the Proposition 65 list, and does so principally in two subdivisions."  (*Brown*, *supra*, 196 Cal.App.4th at p. 239.)  Under subdivision (a), the "list shall include at a minimum those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d)."  (Health & Saf. Code, § 25249.8, subd. (a).)  Subdivision (b) provides three additional processes by which a chemical shall be listed:  (1) "if in the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer"; (2) "if a body considered to be authoritative by such experts has formally identified it as causing cancer"; (3) "or if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer."  (*Id.*, § 25249.8, subd. (b).)

This case centers on the listing mechanism referenced at Labor Code section 6382, subdivision (b)(1).  "Labor Code section 6382 is part of the Hazardous Substances Information and Training Act . . . and sets forth criteria for the preparation and amendment of a list of 'hazardous substances' in the workplace."  (*Brown*, *supra*, 196 Cal.App.4th at p. 240.)  Under subdivision (a), a list of hazardous substances shall be

7.

prepared that includes "[a]ny substance designated in any of the following listings in subdivision (b)," all of which are presumed hazardous. (Lab. Code, § 6382, subd. (a).) Subdivision (b)(1) identifies as hazardous, and thus subject to listing, "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer." (*Id.*, subd. (b)(1).) Under *Brown* and as a result of the interconnected nature of Proposition 65, its regulations, and Labor Code section 6382, more fully discussed below, when the Agency lists a substance as a human or animal carcinogen in Group 2A (as occurred here) and determines there is sufficient evidence of carcinogenicity, that substance must then be added to Proposition 65's list of chemicals known to the state to cause cancer. (See *Brown*, at pp. 259–260; *Styrene Information & Research Center v. Office of Environmental Health Hazzard Assessment* (2012) 210 Cal.App.4th 1082, 1094–95, 1101.)

On appeal, appellants pursue four challenges to the Labor Code listing mechanism, each of which they claim are supported by sufficient facts to state a cause of action. First, appellants contend the Labor Code listing mechanism violates article II, section 12 of the California Constitution (hereafter, art. II, § 12). Second, appellants assert that the Labor Code listing mechanism is an unlawful delegation of authority. Third, appellants argue use of the Labor Code listing mechanism violates procedural due process rights. Finally, appellants state the Labor Code listing mechanism violates the Guarantee Clause of the United States Constitution.[3] We consider each in turn.

### *Standard of Review*

"A motion for judgment on the pleadings may be made on the ground that the complaint fails to state facts sufficient to constitute a legally cognizable claim. [Citations.] In reviewing the grant of such a motion, an appellate court applies the same

---

[3] Appellants initially raised, but subsequently abandoned, a fifth position, that the trial court wrongly concluded claims that the Labor Code listing mechanism violates appellants' right to free speech were unripe.

rules that govern review of the sustaining of a general demurrer. [Citation.] Thus, 'we are not bound by the determination of the trial court, but are required to render our independent judgment on whether a cause of action has been stated.' " (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1401.) "When conducting this independent review, appellate courts 'treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law.' " (*Esparza v. Kaweah Delta Dist. Hospital* (2016) 3 Cal.App.5th 547, 552.) " 'The judgment must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.' " (*Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 603.)

### *Violation of Article II, Section 12*

Under article II, section 12, "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that . . . names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect." Appellants contend their complaint adequately stated a claim under this provision. On appeal, the parties dispute whether the Agency is a "private corporation," whether it was named or identified by the initiative, and whether the initiative provided the Agency with any power. We conclude appellants cannot state a claim for relief because the Agency does not qualify as a private corporation under the constitutional provision. Accordingly, we do not reach the remaining disputes.

9.

*Case Law Concerning the Meaning of Private Corporation*

There are few cases discussing article II, section 12, including it appears, only one that directly considers the scope and meaning of the phrase "private corporation" in that context: *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 (*Calfarm*). *Calfarm* involved various challenges to Proposition 103, an initiative focusing on the regulation of automobile and other types of insurance. (*Calfarm*, at p. 812.) One of those challenges concerned whether the "creation of a consumer-advocacy corporation, and the mailing of notice to invite policyholders to become members of that corporation, violates article II, section 12." (*Id.* at p. 815.) The proposition required every insurer provide notice to policyholders of "the opportunity to join an independent, non-profit corporation which shall advocate the interests of insurance consumers in any forum." (*Id.* at p. 831.) This, at the time, nonexistent organization would be "established by an interim board of public members designated by the commissioner and operated by individuals who are democratically elected from its membership." (*Ibid.*) The parties agreed that the expected corporation "would probably be classified as a 'nonprofit public benefit corporation' under Corporations Code section 5110 et seq." (*Id.* at pp. 833–834.)

In considering the arguments made in *Calfarm*, our Supreme Court both outlined the history of article II, section 12, and provided guidance regarding its understanding of the purpose of the law. As the court explained, the "section is an amalgam of two constitutional provisions enacted to prevent the initiative from being used to confer special privilege or advantage on specific persons or organizations." (*Calfarm*, *supra*, 48 Cal.3d at p. 832.) With respect to the prohibition on naming private corporations, the court sketched the provision's history from its initial enactment in 1964 through its revision when included in the comprehensive constitutional reforms of the Constitution Revision Commission in 1966. (*Calfarm,* at p. 833.) The court noted that the "Legislature considered, but rejected, limiting this prohibition to profit-making corporations" and that the 1966 revisions added a "prohibition against 'identifying' as

10.

well as 'naming' " corporations and extended the provision to encompass initiative legislation. (*Ibid.*) It also identified the "evil which the constitutional prohibition seeks to prevent [as] the conferring of special privilege upon some organization sponsoring the initiative." (*Ibid.*)

Turning to the specific issues raised in that case, the court first considered whether a nonprofit corporation is exempt from the prohibition of article II, section 12. The court concluded such a decision would run "contrary to the intent of the 1964 Legislature in proposing the predecessor of the present constitutional prohibition." (*Calfarm*, *supra*, 48 Cal.3d at p. 834.) The court then touched upon whether the corporation at issue was a private corporation. While the initiative initially established the corporation with persons appointed by the Insurance Commissioner, a public officer, individuals " 'democratically elected from its membership' " thereafter governed it. Accordingly, the court concluded the contested entity "must be classified as a private corporation under article II, section 12." (*Calfarm*, at p. 834.)

In reaching this conclusion, the court included a footnote referencing its analysis of the status of the State Bar, which is a public corporation by law, and noting it was "the extensive network of legislative regulation of the bar which sets it off from ordinary private associations and led us to decide that the bar was more closely analogous to a governmental agency." (*Calfarm*, *supra*, 48 Cal.3d at p. 834, fn. 28.) As the court's referenced analysis in *Keller v. State Bar* (1989) 47 Cal.3d 1152, 1162 (*Keller*), reversed in *Keller v. State Bar of California* (1990) 496 U.S. 1, explained, a "public corporation" was historically defined by statute as one " 'formed or organized for the government of a portion of the state.' " However, such a definition was not exclusive, as the court had previously held, in *State Bar of California v. Superior Court* (1929) 207 Cal. 323 that the statutory definition "could not limit the Legislature from enacting subsequent statutes creating public corporations for purposes other than the government of a portion of the state." (*Keller*, at p. 1163.) We see this analysis as consistent with the modern

11.

recognition that a public corporation "is a term of art used to designate certain entities that exercise governmental functions" and that such public corporations are, similarly, not public entities. (*Hagman v. Meher Mount Corp.* (2013) 215 Cal.App.4th 82, 87–88.)

The guidance provided by the Supreme Court does not directly resolve the disputes in this case. However, in its broad discussion of the intent of the initial amendment and the evils that it intends to protect against, the court signals that the provision is broadly designed to protect against the initiative process being used to award special privileges not otherwise available to competitors. While the specific examples discussed are couched in the language of the matter before it—the specific use of a nonexistent, nonprofit corporation—the court's general analysis utilizes the term "organization" when discussing the overall prohibition, suggesting it viewed the provision's scope broadly. (*Calfarm*, *supra*, 48 Cal.3d at pp. 833–834.) The court's reference to the State Bar further supports the notion that the provision should be read broadly. By highlighting its conclusion that the State Bar is akin to a "governmental agency" despite its status as a public corporation, referencing the pre-1930 history of nongoverning governmental bodies being called public corporations, and using its analysis of the State Bar's government control and regulation as a counterpoint to "ordinary private associations," the court appears to have intentionally adopted a broad view of the provision's scope. (*Id.* at p. 834, fn. 28.)

*Factual Assertions Regarding the Structure of the Agency*

With this guidance in mind, we recount the allegations made regarding the Agency's structure. In the operative complaint, appellants provided an overview of the Agency, given the acronym IARC. As the complaint alleges, "IARC is a specialized cancer agency of the [World Health Organization] that is based in Lyon, France." The Agency is "funded by the governments of 25 countries, as well as by grants from various governmental and non-governmental agencies." A director selected by majority vote by the Agency's governing council, a group composed of representatives of 25 participating

states and the director-general of the World Health Organization, oversees the Agency. The United States is one of the 25 participating states that has a seat on the governing council. Each of these facts is generally supported by the Agency's governing documents, which were presented for judicial notice without objection.[4]

*Categorizing the Agency*

In light of these facts, appellants argue the Agency is private, in part, because it "is not a state or federal governmental entity and is not accountable to any particular electorate." Appellants further contend the Agency is a corporation because it is a "body 'formed and authorized' pursuant to a resolution of the World Health Organization; it is 'legally endowed with various rights and duties' pursuant to its implementing statute, rules, and regulations; and it has 'the capacity of succession' (*i.e.*, it exists in perpetuity)." Appellants summarize their position by claiming a private corporation under the Constitution must broadly "encompass a range of organizations that are not accountable to governmental bodies." While appellants' broader argument is well-taken, we do not agree it extends to properly include entities like the Agency.

Appellants' arguments stretch the meaning of a private corporation to the breaking point. While it is true, as appellants and amici fear, that limiting the definition of a corporation to just those specialized corporate forms contained in the first part of the corporate code would exclude a wide range of potentially problematic organizations, such

---

[4]     Appellant Monsanto, respondent Office, and respondent Sierra Club all filed requests for judicial notice relevant to the briefing. Objections were raised to only a few of the documents or facts proffered. We considered the motions, objections, and replies filed. We hereby grant each request for judicial notice. However, as most of the facts proffered for notice are irrelevant to the ultimate analysis or duplicative of properly pleaded facts, we will include in this opinion only those judicially noticed facts bearing on our ultimate analysis and will specifically identify their use. We specifically note that our opinion would not change were any of the judicially noticed documents excluded from consideration.

as the more recently created limited liability company (LLC) corporate form,[5] this concern cannot be used to expand the concept to capture something like the Agency.  Nor is it simply sufficient to argue the Agency is not a "public corporation" as that phrase is used in California law.  Despite the inference in its analysis that the meaning of a private corporation should be understood broadly, nothing in our Supreme Court's analysis in *Calfarm* limited the notion of that phrase's antithesis to the strictly defined local governmental organizations historically imbued with the name public corporation.  We further find no guidance in the law that would draw an arbitrary line between state and federal or federal and international governmental entity control when determining the public/private issue.  Thus, while it is true that many of the statutes defining public entities focus on government at the state level, it is notable that Evidence Code section 200 takes a much broader view of the meaning of a public entity by expressly enveloping foreign entities.[6]  And while *Calfarm* does suggest that substantial governmental oversight at the state level is sufficient to classify an organization, such as the State Bar, as public and akin to a government agency, we see nothing in the court's analysis that limits the type of relevant oversight to the state level.  As such, we reject appellants' claim that the phrase private corporation covers any legally formed and perpetual organization created and jointly operated by domestic and foreign governments.

While the Agency does not cleanly qualify as a public corporation under California law, or fit the general notion of a domestic public agency, it need not do so to be exempt from the prohibitions of article II, section 12.  Rather, it merely need not be a private corporation.  Under the facts alleged in the complaint and acknowledged in this

---

[5]     The LLC corporate form was first introduced in Wyoming in 1977 and permitted in all states by 1996.  California permitted LLC's in 1994.  (See Hamill, *The Origins Behind the Limited Liability Company* (1998) 59 Ohio St. L.J. 1459, 1460, 1476–1477.)

[6]     Evidence Code section 200 defines public entity to include "a nation, state, county, city and county, city, district, public authority, public agency, or any other political subdivision or public corporation, whether foreign or domestic."

14.

appeal, the Agency meets this test. Its formation as an intergovernmental agency under international law and its oversight and general management by United States and foreign government agents demonstrates that the Agency is not a private corporation as contemplated by article II, section 12.[7] Accordingly, the trial court was correct in dismissing this claim.

## *Unconstitutional Delegation of Rulemaking Authority*

Appellants' second position claims that the Labor Code listing mechanism constitutes an unconstitutional delegation of authority to the Agency. Relying on a line of cases exemplified by *International Association of Plumbing and Mechanical Officials v. California Building Standards. Commission* (1997) 55 Cal.App.4th 245 (*IAPMO*), appellants contend the Labor Code listing mechanism and the Office's interpretation that listing chemicals is a ministerial action grants the Agency final rulemaking authority with respect to California law. More broadly, appellants contend the Labor Code listing mechanism delegates a quasi-legislative authority to an outside agency without providing for adequate standards or appropriate safeguards. Intertwined with these positions are disputes concerning the nature of appellants' attack on the Labor Code listing mechanism, the relevance of the overall statutory scheme enacted by Proposition 65, and the trial court's decision not to grant leave to amend the complaint.

### *Classifying Appellants' Challenge*

We begin with a dispute the parties have raised concerning the standards we apply to determine whether the Labor Code listing mechanism is, in fact, constitutionally deficient. According to respondents, appellants are raising a facial attack on the statute that requires this court to conduct an "exacting" and deferential analysis. Appellants

---

[7] That the Agency may rely on private citizens to conduct research for its Monographs does not change this analysis. As *Calfarm* shows, it is the management of the company, not its lower level employees or contractors that are relevant to determining if the entity is private. Here, those managers are governmental agents. (*Calfarm, supra,* 48 Cal.3d at p. 834.)

15.

disagree, contending they are challenging the statute on an "as-applied" basis with respect to the manner in which glyphosate was listed. This dispute affects our analysis, as there are different considerations applicable to each type of challenge presented.

As a general matter, there are two types of challenges to the constitutional validity of a statute, facial and as applied. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Ibid.*) To prevail on such a challenge, " ' "petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Ibid.*) In contrast, as-applied challenges seek "relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied." (*Ibid.*)

Respondents contend appellants' challenge must be viewed as facial, given the broad arguments made that the statutory scheme as a whole fails constitutional review. For example, appellants argue in various places that "Proposition 65's abdication of rulemaking authority to IARC . . . constitutes a *per se* violation of the non-delegation doctrine." Such language strongly hints at a facial challenge. However, as appellants point out, certain portions of their claims do, in fact, turn on the specific factual scenario pled in this case. For example, appellants' positions regarding the necessary safeguards required in a proper delegation of authority turn in part on the assertion that the interpretation of the statute applied by the Office contradicts the Office's pre-existing determination that glyphosate is not likely carcinogenic and gives the Agency's determination the force of law. In addition, as appellants note, their actual assertion in the complaint alleges only that "[t]he so-called Labor Code listing mechanism, as applied

by OEHHA in proposing to list glyphosate under Proposition 65, violates the California and United States Constitutions."

In this context, we agree with appellants that an as-applied challenge is at issue. Although not common in the case law, California has recognized that constitutional challenges to statutes can take on an as-applied character when implementation of the statutory scheme forms the basis of the challenge. (See *Solberg v. Superior Court* (1977) 19 Cal.3d 182, 194–198 [rejecting "as applied" challenge to statute alleged to violate the doctrine of separate of powers].) Although the right allegedly violated is not specific to appellants—being the general prohibition on the delegation of authority—the facts alleged in support of the claim that such a violation occurred are specific to appellants in this case. (See *San Francisco Unified School Dist. v. City and County of San Francisco* (2012) 205 Cal.App.4th 1070, 1079.)

*Applicable Law*

"An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190 (*Carson Mobilehome*).) As our Supreme Court recently recounted, where the fundamental policy issues have been resolved the further delegation of quasi-legislative power is generally constitutional provided there is adequate direction for implementation of the policy and sufficient safeguards to prevent arbitrary or abusive implementation of the policy. (*Gerawan Farming, Inc. v. ALRB* (2017) 3 Cal.5th 1118, 1146, 1148, 1150–1151 (*Gerawan*).) "The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse." (*People v. Wright* (1982) 30 Cal.3d 705, 712–713.) Thus, " '[i]t is well settled that the legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring

17.

it within a rule or standard previously established by the legislature.' " (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 376 (*Kugler*).) And the Legislature may validly " 'delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend.' " (*Ibid.*) Indeed, as we once noted, "[o]nce the Legislature has established the law, it may properly delegate the authority to administer or apply the law to private or governmental entities." (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632.)

Appellants challenge every aspect of the alleged decision to delegate listing authority to the Agency, claiming the decision constitutes a complete abdication of policy setting authority, that there is no adequate direction for implementing the listing decision, and that there are no safeguards to ensure the listing determinations are not made arbitrarily or in an abusive manner. We, however, find no error.

*Delegation of Fundamental Policy Decisions*

Upon review, we find the statutory scheme does not leave fundamental policy decisions to others. Although appellants implicitly argue the decision to list a particular chemical under Proposition 65 is a fundamental policy issue over which the government must retain final authority, we do not agree. Throughout the case law, challenges to various statutes have suggested that one aspect or another of the contested statutory scheme delegates a fundamental policy determination to others. These arguments have rarely succeeded because the relevant analysis considers motivations broader than the specific mechanism challenged.

In *Kugler*, for example, a challenge was raised to the proposed process by which the Alhambra City Council would set wages for firefighters. Although the challenge focused on whether relying on wages set by Los Angeles County constituted an improper delegation of authority, the Supreme Court took a broader view of the fundamental issue resolved by the legislation. In particular, the court explained that the proposed statute would "constitute the legislative body's resolution of the 'fundamental issue' " because it

18.

would establish a policy that "wages for firemen should be on a parity with Los Angeles." (*Kugler*, *supra*, 69 Cal.2d at p. 377.) Similarly, in *Gerawan*, although the parties raised several disputes regarding the implementation of the mandatory mediation and conciliation provisions of the Agricultural Labor Relations Act (ALRA), the court concluded the Legislature did not abdicate its duty to make fundamental policy decisions because it broadly determined the system was needed " 'in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA.]' " (*Gerawan*, *supra*, 3 Cal.5th at p. 1147.)

In the context of Proposition 65, the electorate clearly made a similarly broad determination regarding the fundamental policy issues behind the proposed legislation. As *Brown* detailed, Proposition 65 was a remedial statute designed in part so the people of California would " 'be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.' " (*Brown*, *supra*, 196 Cal.App.4th at p. 258.) This scheme was seen as necessary because the people concluded " 'that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs.' " (*Ibid.*) Thus, the various listing mechanisms were included to ensure "the Proposition 65 list of chemicals 'known to the state to cause cancer or reproductive toxicity' *always* includes 'at a minimum' those substances identified by reference to Labor Code section 6382, subdivisions (b)(1) and (d)." (*Id.* at p. 259.) Indeed, this desire to be informed generally led to multiple listing mechanisms that effectively exclude state review of the decision. (*Id.* at pp. 259–260.)

In this manner, the electorate clearly resolved the fundamental policy issues. The procedures by which such listing determinations are made are thus the working details on how to implement the broader policy of notification and warning with respect to

19.

carcinogenic compounds and not, as appellants argue, the fundamental policy decisions underlying the legislation.

*Classifying the Delegation of Authority*

Although we conclude that the proposition did not fail to resolve fundamental policy issues, we must continue to determine whether there has been any delegation of authority recognizable as potentially problematic under the law. Again, we conclude there has not.

Respondents urge us to conclude that there has been no delegation of authority at all. Relying on footnote 6 from *Kugler*, respondents argue that a factual determination by another entity made independently of the disputed statute, and not in response to it, is not a delegation of authority at all. Footnote 6 arises as the court discusses whether setting a formula for determining salary adjustments constitutes a delegation of legislative authority. After confirming California had upheld the use of prevailing wage statutes in the past, the court notes, "other states likewise sustain the power of the legislative body to base compensation for the involved employees upon comparable prevailing wages." (*Kugler*, *supra*, 69 Cal.2d at p. 379.) Following a review of one of these cases, the court includes footnote 6. The note first distinguishes two prior California cases, both of which withheld from deciding whether a statute could incorporate future laws passed in other jurisdictions, before comparing the court's analysis to a case from the Supreme Court of Wisconsin, called *State v. Wakeen* (1953) 263 Wis. 401, 411 (*Wakeen*).

In *Wakeen*, the Wisconsin Supreme Court had found no delegation of legislative authority occurred when the determination to restrict the sale of drugs in the future was tied to the future determination of a recognized private pharmaceutical institution. The *Wakeen* court concluded such a delegation was proper because the publications identifying future prohibited drugs were not published in response to any delegation of authority in the contested statute but, rather, were independent of the law. (*Kugler*, *supra*, 69 Cal.2d at p. 379, fn. 6.) The California Supreme Court noted, "Similarly, in our

20.

case an independent, authoritative source determines the comparable Los Angeles rates, and such decision is made 'independently of the statute and not in response to it.' " (*Ibid.*)

We do not read this footnoted citation to a Wisconsin case to affirmatively hold, as the Office argues, that any decision to rely upon factual determinations made independently of a statute, and not in response to it, is definitively not subject to delegation concerns. The court's overall analysis shows that the reason no improper delegation occurred in *Kugler* was because the reliance on an independent factual determination did not set policy and there were sufficient safeguards to ensure that the relevant factual determinations were not arbitrarily made. The court's citation to *Wakeen* was made in the context of confirming other states did not see an unlawful delegation when reliance on outside determinations or formulae necessarily made in the future were used.

To read any broader meaning into the citation would undercut the court's own citations to core California law assertions of relevant principles. As noted above, the court clearly understood California law to state that the legislative power " 'to determine whether the facts of a particular case bring it within a rule or standard previously established by the legislature' " may "properly be delegated if channeled by a sufficient standard." (*Kugler*, *supra*, 69 Cal.2d at pp. 375–376.) Likewise, the court explained the Legislature "can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend." (*Id.* at p. 376.) In both instances, the court's language demonstrates that determining factual matters relevant to identified policy is, in fact, a form of legislative power that must be properly managed. Such specific summaries of well-settled California law should not be overturned by a footnote comparing a general conclusion with the holdings of other states.

21.

In this case, both parties refer to the determination whether or not to list a chemical as known to the state to cause cancer as a quasi-legislative power. We agree with this classification and note the further delegation of the factual determination underlying that listing decision is, likewise, quasi-legislative. As the factual determination does not leave broad policy determinations to another, it is not a pure abdication of legislative authority. However, because the delegated power determines some fact upon which the broader law makes its action depend, it is within the legislative sphere. Accordingly, under the analysis employed by our Supreme Court, we must determine whether the nature of this delegation of authority assures that the electorate's policy decisions are implemented as made, through adequate direction and suitable safeguards to protect against abuse. (See *Gerawan*, *supra*, 3 Cal.5th at pp. 1146–1147.)

### The IAPMO *Line of Cases*

In this analysis, we first take up appellants' argument that the delegation to the Agency of authority to determine carcinogenicity imbues that agency with the authority to enact rules that acquire the force of law and, under the facts of this case, effectively grant it veto power over the state's independent assessments. On this point, appellants rely on a line of cases epitomized by *IAPMO*, which primarily but not exclusively deal with the adoption of building codes. Appellants argue these cases stand for the proposition that the Legislature cannot delegate the authority to make future decisions without retaining final authority to review those decisions.

We do not find these cases controlling in this situation. Our conclusion that the electorate has adequately identified the broad policy goals of Proposition 65— specifically the identification and listing of known carcinogens, coupled with required warnings—and provided a framework within which new chemicals could be added distinguishes these cases. In *IAPMO* the court was asked to interpret the law to say that model building codes were automatically adopted as the regulations governing future construction projects. The court rejected this request in part because the law

22.

contemplated regularly enacting building regulations that should be modeled on, but need not be, model codes. (*IAPMO*, *supra*, 55 Cal.App.4th at pp. 251, 254) In other words, the overall statutory scheme contemplated the creation of new regulations on a regular basis. The delegation of this future regulatory authority was rightfully noted to be impermissible unless adequate safeguards in the form of government oversight were included. (*Id.* at pp. 253–254.) The same is true of all the cases cited by appellants in support of this argument. In each, the determination of a private entity would generate new regulations and not simply place a new item within the scope of existing regulations. In contrast, Proposition 65 adequately defines the framework of the law and delegates not the regulatory determinations regarding what to do, but the factual determinations of what chemicals are subject to the law as written.

The factually based implication that the Labor Code listing mechanism created an effective veto power over the Office's prior analyses is, similarly, not compelling. The stated intent and adopted structure of Proposition 65 provide a broad mechanism for listing those chemicals known to the state to cause cancer. Under Health and Safety Code section 25249.8, subdivision (b), Proposition 65 lays out a broad and overlapping basis for determining the chemicals to list that is couched in the disjunctive. Thus, a "chemical is known to the state to cause cancer . . . if in the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer . . . , *or* if a body considered to be authoritative by such experts has formally identified it as causing cancer . . . , *or* if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer." (Health & Saf. Code, § 25249.8, subd. (b), italics & bolding added.) Likewise, in including "at a minimum those substances identified by reference in Labor Code section 6382(b)(1) and those substances identified additionally by reference in Labor Code section 6382(d)," (*id.*, subd. (a)), the electorate adopted a

23.

broad system for listing products that included potential conflicts given the multiple sources for determining known carcinogens.

Having adopted such a sweeping inclusionary process, the implication that a veto authority exists in the context of this case carries little weight. The overall goal of the statutory scheme is inclusive and, thus, any suggested veto would be expected to keep carcinogens identified by one agency off the list because another agency disagreed. It is thus a designed statutory function, not a veto power, that allows one of the various mechanisms for listing a chemical as known to the state to cause cancer to ensure that chemical is on the list regardless of whether other identified listing agencies or processes agree. In this context, the factual determination whether a chemical is carcinogenic and, thus, subject to the overall framework of the statute depends on whether any of the identified bases for listing the chemical are met. Provided adequate directions and safeguards exist with respect to the policy decisions made, the process for resolving conflicts in factual data is not an unlawful delegation of authority. We therefore consider those issues next.

*Directions for Implementation and Relevant Safeguards*

Looking at Proposition 65, the statutory scheme provides adequate direction for its implementation. The enacted laws prohibit the knowing discharge or release of chemicals known to the state to cause cancer and prohibit knowing and intentional exposure to any such chemical without providing clear and reasonable warning. (Health & Saf. Code, §§ 25249.5, 25249.6.) The statutory scheme further describes enforcement mechanisms and exemptions to the prohibitions before providing that additional implementation and regulatory details will be handled by an agency designated by the Governor. (*Id*., §§ 25249.7, 25249.9, 25249.10, 25249.12.)

Specifically focusing on the listing of chemicals known by the state to cause cancer, the statutory scheme requires the Governor to publish and regularly update a list of the relevant chemicals. (Health & Saf. Code, § 25249.8, subd. (a).) The scheme

further identifies a set of chemicals which must be included in the list and a general mechanism for determining whether a chemical is known to the state to cause cancer. (*Id*., subds. (a), (b).)  As noted above, these directions reference a list already being generated through the requirements of Labor Code section 6382, subdivision (b)(1), along with others, and are generally drafted to be as inclusive with respect to the chemicals listed as possible, within the confines of valid scientific testing.  Thus, in the context of determining whether a chemical should be listed as known to the state to cause cancer, the statutory scheme provides substantial directions on determining when the chemical has been identified in a manner sufficient to say the state knows it causes cancer.

Appellants argue the required directions are lacking because the statutory scheme provides no instructions to the Agency with respect to how it should test for carcinogenicity.  This argument misses the mark, however.  The standards necessary for determining whether an unlawful delegation has occurred focus on whether the "Legislature 'provide[d] an adequate yardstick for the guidance of the administrative body empowered to execute the law.' " (*Gerawan*, *supra*, 3 Cal.5th at p. 1150.)  The law being executed in this instance is not the scientific testing of potential carcinogens, but the listing of those chemicals known by the state to cause cancer.  In providing directions for making this determination, the statutory scheme identifies several ways by which the state will be said to know a chemical causes cancer.  One of those ways is if the chemical is identified by reference in Labor Code section 6382, subdivision (b)(1)—one of the mechanisms by which the Agency's decisions are considered by the state.  Another, contained in subdivision (b) of Health and Safety Code section 25249.8 states a chemical is known to cause cancer "if a body considered to be authoritative by such experts has formally identified it as" such.  In both of these examples, the statutory scheme provides a framework by which the required list regarding the identification of known carcinogens can be propagated.  The electorate's decision to rely upon third-party determinations

25.

rather than explicitly detail the scientific processes necessary to determine a chemical is a carcinogen does not mean the statute lacks directions for determining whether a chemical is placed on the list.[8]

Sufficiently clear standards for implementation are not dispositive alone, they must also be coupled with adequate protections against abuse of the delegated authority.[9] These safeguards may be inherent. For example, in *Kugler* the court noted the contested ordinance contained "built-in and automatic protections" in the form of inherent motivations in Los Angeles "to avoid the incurrence of an excessive wage scale," and inherent economic factors that would result in realistic wage levels. (*Kugler*, *supra*, 69 Cal.2d at p. 382.) The safeguards may also derive from the statutory scheme itself. Thus, in *Gerawan*, the court recited the "numerous procedural safeguards throughout" the contested statutory scheme that protected "the parties form arbitrary or unfair action." (*Gerawan*, *supra*, 3 Cal.5th at p. 1151.) These included the joint selection of a mediator, potential review avenues, and ultimately an ability to challenge the determination in court (although such a requirement was not necessary to sustain the statutory scheme). (*Ibid.*) In another example, the fact the agency in charge of enforcement placed itself "between the governing bodies [those setting the contested rules] and the regulated growers [those

_____

[8]    In this sense, the determination is not significantly different from that approved in *Gerawan*, where the court explained that the standards provided to mediators do not need to rise to the level of specific formulas provided they sufficiently identify factors to consider when acting. (*Gerawan*, *supra*, 3 Cal.5th at p. 1149.) Here, the factors given to the Office on whether to list a chemical do not set forth the processes third parties must use to reach a conclusion on carcinogenicity, rather they state the matter is settled if the agency is authoritative and makes that determination. We conclude this is a sufficient framework for implementing the policy embodied in the law.

[9]    We recognize *Gerawan*'s statement that sufficiently clear standards must be accompanied by safeguards adequate to prevent abuse conflicts with the court's discussion of *Warren v. Marion County* (1960) 222 Ore. 307 in *Kugler*. There, although the court found both sufficiently clear standards and adequate safeguards, its discussion suggested adequate safeguards were more important and could obviate the need for clear standards in the statute. (*Kugler*, *supra*, 69 Cal.2d at pp. 380–382.) We need not resolve whether *Gerawan* implicitly overruled *Kugler*, however, as both requirements are satisfied in this case.

subject to the contested rules]" by requiring its approval before enforcement occurred was a relevant factor in finding adequate safeguards. (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1492.)

Looking at the statutory scheme, we find there is a built-in safeguard that provides adequate protection against potentially arbitrary or abusive determinations that certain chemicals are known to the state to cause cancer. For both the discharge and exposure prohibitions, the statute creates exemptions to liability provided the "person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question." (Health & Saf. Code, §§ 25249.10, subd. (c), 25249.9, subd. (b) & 25249.11, subd. (c).) This built in safeguard ensures that chemicals that can be shown not to be carcinogenic will not be subject to the enforcement provisions of Proposition 65. Thus, the statutory scheme essentially designates the Agency as an authoritative body on potential carcinogens but protects those potentially subject to its determinations by allowing them to affirmatively disprove the Agency's factual determinations.

This safeguard is further buttressed by the regulatory scheme enacted to implement Proposition 65. As noted, the statutory scheme provides an exception to the discharge and exposure provisions where the person responsible demonstrates there is no significant risk of cancer assuming a specific lifetime exposure. (See Health & Saf. Code, § 25249.10, subd. (c).) Additional regulations determine how the Office determines the meaning of "no significant risk." (*Ibid*.) These regulations mandate that the "no significant risk" determination "be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of the chemical." (Cal. Code Regs., tit. 27, § 25701.) One manner of determining this figure is through a quantitative analysis pursuant to California Code of Regulations, title 27, section 27503. Under this analysis, any "[a]nimal bioassay studies for quantitative risk assessment shall meet generally accepted scientific principles," and

the "quality and suitability of available epidemiologic data shall be appraised to determine whether the study is appropriate as the basis of a quantitative risk assessment," among other standards. (*Id*., subd. (a) (1) & (2).) The minimal risk necessary to trigger a standard is set at "one excess case of cancer in an exposed population of 100,000, assuming lifetime exposure at the level in question." (*Id*., subd. (b).) And if it can be demonstrated that certain types of exposure do not result in an increased cancer risk, the regulations allow declaring that such exposures pose no substantial risk. (*Id*., § 25707, subd. (a).)

The import of these regulations is a safety net that shields responsible persons from the statutory punishments if a listing determination is arbitrary or abusive. While the chemical will still be listed as known to the state to cause cancer, the Office will be required to utilize sound scientific evidence when setting the relevant exposure levels, above which the law creates obligations and potential penalties. If a listing decision is believed to be arbitrary or abusive, these additional regulations prevent that action from triggering the law's public protections by forcing a regulatory determination that substantial exposure qualifies as "no significant risk." In this way, the regulations place the Office between the listing determination and the enforcement of the law.

Finally, we recognize that there are safeguards inherent in the statute's identification of the Agency as one of the entities responsible for determining whether a chemical is known to the state to cause cancer. As appellants' factual assertions in the complaint show, the Agency is an international agency created specifically to scientifically investigate potentially carcinogenic compounds. Its reputation and authority on the world stage—and relatedly its funding—is dependent, in part, on its work being accepted as scientifically sound. The Agency will thus be motivated to avoid arbitrarily defining compounds as carcinogenic and will be more than likely prone to utilizing accepted scientific protocols in its research. The international cooperation in the Agency's formation, these inherent safeguards, and the fact the Agency began conducting

its work well before Proposition 65 passed demonstrate the Agency is "an agency that the Legislature can expect will reasonably perform its function" in the same manner the United States Department of Labor was identified in *Kugler* as an example of a body reasonably expected to perform the function of ascertaining the cost of living. (See *Kugler*, *supra*, 69 Cal.2d at p. 382.)

Appellants pursue two general and partially related attacks on the standards and safeguards considered above. In the first, appellants contend the standards identified are irrelevant because they do not provide any direction to the Agency on how to proceed when making its factual determination. In the second, appellants contend they have alleged sufficient facts concerning the Agency's reputation and the process by which glyphosate was determined by the Agency to be carcinogenic to adequately raise an issue regarding the safeguards in place to ensure the Agency does not act arbitrarily. We do not find appellants' arguments compelling.

With respect to the assertion the standards and safeguards discussed above are not directed to the Agency, and thus do nothing to ensure that listing determinations are not made arbitrarily, as noted previously appellants' arguments are unsustainably narrow. There is nothing in the case law that suggests the relevant safeguards or standards must be directed to the specific agency that has been delegated authority to act. Rather, the relevant analysis is whether the standards and safeguards ensure, at an overall level, that the authority delegated is not abused or applied arbitrarily. Thus, while in many instances the statutory scheme provides direct guidance to the delegate, such as in *Gerawan* where the statute included a nonexclusive list of factors for the mediator to consider, (*Gerawan*, *supra*, 3 Cal.5th at p. 1148), the law has not limited its analysis to only those standards and safeguards directed at the delegate. In *Gerawan* itself, the court considered additional safeguards such as the statutory requirement that the parties agree on a mediator or select from a specific list and the ability to petition for review of decisions. (*Id.* at p. 1151.) Likewise, in *Kugler*, the relevant statutory scheme provided

no guidance to Los Angeles regarding how it should determine fair wages for firefighters, yet the court found multiple reasons why sufficient standards and safeguards were present. (*Kugler*, *supra*, 69 Cal.2d at pp. 381–382.) Indeed, the court has gone as far as expressly stating that the lack of specific formulas regarding how to implement a policy will not render a statutory scheme unconstitutional. (*Carson Mobilehome*, *supra*, 35 Cal.3d at p. 191.)

For similar reasons, we find the factual assertions appellants make about the Agency, the formation of the working group investigating glyphosate, the potential ties to the plaintiff's bar of the working group's lead scientist, and the general assertions regarding the alleged malleability of the Agency's procedures to be factually irrelevant to the analysis. Appellants' assertions in this context all rely on the starting assumption that failures at the Agency itself are sufficient to demonstrate the standards and safeguards set up when delegating the Agency authority to make factual determinations are insufficient when applied to the listing of glyphosate. These arguments do nothing to attack the efficacy of the safeguards built into the statutory scheme itself. Just as the law does not require that specific directions be given to the delegate because the broader statutory scheme, purpose, or inherent requirements protects against abuse, a challenge to the delegate's actual conduct ignores that the required standards and safeguards are measured against their ability to ensure such allegations do not actually result in arbitrary or abusive conduct. As discussed above, the safeguards in place are sufficient to protect against such a result.[10]

---

[10]    We find nothing persuasive about appellants' claim that merely listing glyphosate results in consequences sufficient to demonstrate abusive or arbitrary results. None of the potential losses identified by appellants in this context derive from Proposition 65 itself. Rather, they appear to derive from independent decisions to undertake enforcement actions or otherwise limit purchasing decisions only loosely tied to the challenged listing mechanism. As such, under the statutory scheme at issue, the protections provided in the statutes and regulations ensure that the delegated factual determination authority cannot be used by the Agency to arbitrarily or abusively invoke the law's coercive punishments.

For these reasons, we conclude the factual allegations made are insufficient to support any claim the standards and safeguards are insufficient, even on an as-applied basis. Indeed, reviewing the nature of the standards and safeguards discussed, we see no factual scenario—absent a modification of the statutes or rejection of the regulatory protections, unsupported by any facts or argument—that would support a challenge to the statute for improper delegation of authority. Accordingly, we find no error in the trial court's decision to dismiss this claim or its refusal to allow further amendment. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [demurrer sustained without leave to amend is affirmed where there is no reasonable possibility that the defect can be cured by amendment].)

### *Appellants' Remaining Positions*

Appellants also claim the listing of glyphosate violated their rights to procedural due process and that the Labor Code listing mechanism violates the Guarantee Clause of the United States Constitution. We reject both of these positions.

With respect to their procedural due process claim, appellants recognize that "courts often do not apply procedural due process protections to quasi-legislative actions," but maintain that whether quasi-legislative acts are subject to due process protections "is unsettled in California." We do not agree.

The principle that quasi-legislative actions are not subject to procedural due process protections has been clearly articulated by our sister courts and implied by our own prior rulings. "In considering the applicability of due process principles, we must distinguish between actions that are legislative in character and actions that are adjudicatory. In the case of an administrative agency, the terms 'quasi-legislative' and 'quasi-judicial' are used to denote these differing types of action. Quasi-legislative acts involve the adoption of rules of general application on the basis of broad public policy, while quasi-judicial acts involve the determination and application of facts peculiar to an individual case. [Citations.] Quasi-legislative acts are not subject to procedural due

31.

process requirements while those requirements apply to quasi-judicial acts regardless of the guise they may take." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1188; accord, *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482; cf. *Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1183 ["If the action is legislative or quasi-legislative in nature, ' ". . . a hearing of a judicial type is not required; a hearing allowed by legislative grace is not circumscribed by the restrictions applicable to judicial or quasi-judicial adversary proceedings" ' "].) Our own Supreme Court has also referenced this principle. (*McKinny v. Bd. of Trustees* (1982) 31 Cal.3d 79, 98–99.) To the extent the principle remains unsettled in this district, we affirm that quasi-legislative actions, such as the contested listing of glyphosate in this case, are not subject to procedural due process protections and, thus, judgment on the pleadings was proper.

With respect to their Guarantee Clause claim,[11] appellants again recognize a limitation in their position, specifically that "the U.S. Supreme Court has held that claims under the Guarantee Clause *generally* are not justiciable and has never held explicitly that individuals have judicially cognizable rights under that provision," but posit it is equally true "the U.S. Supreme Court also has not foreclosed all such claims." It is true that the United States Supreme Court has not foreclosed the possibility that some claims under the Guarantee Clause are justiciable. (See *New York v. U.S.* (1992) 505 U.S. 144, 184–185 (*New York*).) However, we see nothing in appellants' claims that suggest their arguments warrant a full analysis of potential justiciability under the Guarantee Clause.

Fundamentally, appellants' argument is that a state's delegation of its lawmaking authority is an inappropriate violation of the republican form of government when that delegation is to a foreign agency. Yet there is no question, given the extensive analysis

---

[11]  Contained in section 4 of Article IV of the United States Constitution, the Guarantee Clause provides that, "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ."

32.

of the delegation issue above, that the state has authority to delegate legislative authority under long-settled principles consistent with republican forms of government. The specifics of that authority to delegate and the lengths to which it is permissible sound strongly of the type of political question that has routinely been deemed nonjusticiable in this context. (See *New York, supra,* 505 U.S. at p. 184 [listing cases finding Guarantee Clause challenges nonjusticiable].) Further, even if we found some reason to look past the political nature of the question raised, appellants provide us with no reason or analysis why the United States' guarantee to states that they shall enjoy a republican form of government should provide appellants with an individual right to challenge a state's authority to enact its own laws, as opposed to a right to challenge federal or foreign action impinging upon the state's governing authority.[12] Granting an individual right to enforce the Guarantee Clause as against state action would seem to reopen the long-rejected notion that the citizens of a state might attack those aspects of state law that offended them by alleging the enactment of those laws were a result of Guarantee Clause violations—in essence overturning laws by overturning the state. (See *Pacific States Tel. & Tel. Co. v. State of Oregon* (1912) 223 U.S. 118, 150–151.) Absent any specific ruling by a higher court that such disputes should be resolved by the courts, we conclude the general notion that such questions are nonjusticiable controls here.

---

[12]    "[I]t need not follow from the unavailability of the guaranty clause as a textual source for protection for *individuals* that the clause confers no judicially enforceable rights upon *states* as *states*. It is, after all, the states to which the clause extends its explicit guarantee." (Tribe, American Constitutional Law (2d ed. 1988) p. 398.)

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.

_____
HILL, P.J.

WE CONCUR:


_____
LEVY, J.


_____
PEÑA, J.

34.